MUDSILL MIN. CO., Limited, et al. *v.* WATROUS et al.

(Circuit Court of Appeals, Sixth Circuit. February 5, 1894.)

No. 39.

1. EQUITY—RESCISSION—FRAUD—MATTERS OF OPINION.

A bill for the rescission of the purchase of a silver mine on the ground of fraud alleged that defendant represented that the ore therein contained a certain average of pure silver, making it very valuable, whereas in fact the average was so low that it was worthless; and that defendant had "salted" the samples which complainant took from the mine, and upon the faith of whose analysis the purchase was made, by fraudulently mixing native silver therewith. *Held* that, where the latter allegation is sustained, defendant cannot shelter himself behind the plea that his representations were mere expressions of opinion as to the value of the mine.

2. SAME—EVIDENCE—"SALTING" MINES—ACCIDENT.

In a suit to rescind the sale of a silver mine on the ground of fraud perpetrated by defendant by "salting" the samples of ore taken by complainant for assay, it was shown that there was no native silver in the ore of the mine, but every one of thirty samples taken contained from 80 to 90 per cent. of powdered silver. The assays were made at different places and by different persons, but all with substantially the same result. *Held*, that the evidence showed that the presence of this powdered silver in the samples could not have been accidental.

3. SAME—EVIDENCE—OTHER FRAUDS.

In a suit to rescind the sale of a silver mine on the ground of fraud perpetrated by defendant by "salting" samples of ore, upon the assay of which complainant was induced to purchase, it is competent to show that defendant had "salted" samples used in prior negotiations with other persons for the sale of the same mine.

4. SAME—EVIDENCE—SUFFICIENCY.

In a suit to rescind the sale of a silver mine on the ground of defendant's fraud in "salting" the samples by means of which complainant was induced to purchase, it was shown that defendant had a substantial pecuniary interest in effecting the sale; that some of the samples were tested immediately after being taken from the mine, in which operation they were put into the hopper of a crusher by complainant, and were received by defendant as they came out, at a point which was out of complainant's sight, while the samples not then tested remained for some days in defendant's exclusive possession and control; that the "salting" was done with powdered metallic silver, such as was easily procurable in the market, and which might have been introduced into the samples with a syringe without breaking the seals of the bags; and that, after the presence of metallic silver in the samples was accidentally discovered, defendant opposed the erection of a mill adapted to its separation, he having an interest in the company for which complainant had bought the mine, and knowing that there was no native silver in the ore. *Held,* that the evidence showed that the "salting" was done by defendant.

5. SAME—LACHES—WAIVER.

Complainant purchased a silver mine from defendant, and afterwards discovered that the samples by which he had been induced to purchase had been "salted." He at once attempted to persuade defendant to take the property back, but he refused to do so. Complainant then erected a small mill in order to make more complete tests of the quality of the ore, and also sought to discover evidence to convict defendant of the "salting." He did not reach conviction upon this point until a year after the sale was consummated, and he at once filed a bill for rescission. *Held,* that there was not such a dealing with the property as amounted to a waiver of his right to rescind, nor was he guilty of laches.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

This was a bill by the Mudsill Mining Company, Limited, and Walter McDermott, against Orville A. Watrous and Stewart A. Van Deusen, for the rescission of a sale. The circuit court dismissed the bill, and complainants appeal.

This is a bill for rescission. The subject-matter of the suit is a mining property known as the Mudsill mine, or group of mines, situated eight miles from the town of Fairplay, Park county, Colo. The complainants have tendered to the defendants a deed to the property, and demanded rescission upon the ground of fraud practiced in the sale. The title to these mines, at the time of the sale, was in the defendant Orville A. Watrous. The defendant Stewart A. Van Deusen was interested in the property by virtue of an indefinite parol agreement, and was the active agent in making the sale. The complainant Walter McDermott is a professional mining engineer and assayist, having offices and carrying on business both in London and New York. In the purchase of the Mudsill mine he, as defendants well knew, represented and acted for himself and others, promoters of a corporation intended to be organized for the purchase and operation of these mines. After certain preliminary negotiations, partly with each of the defendants, a proposition in writing was made for the sale of the mine, under date of October 24, 1887, and signed by the defendant Stewart Van Deusen. After referring to the negotiations and understandings theretofore had, this proposal was, in substance, that McDermott should form a company in England, with capital stock at £75,000 sterling, in 75,000 shares of £1 each; of this Van Deusen was to receive 37,500 shares, of which he agreed to transfer to the company 1,000 shares, to go into the treasury, and to be sold for not less than par value. In addition to the 37,500 shares, the proposal required that he was to receive $110,000, with which he agreed to pay off all mortgages, debts, and claims, of every description, against the Mudsill property. The company is to have a paid-up working capital of 15,800 pounds sterling. The proposal further required the company to erect a first class 20-stamp mill, with amalgamation pans and

true vanners, and that work should begin on the same as early in 1888 as the weather would permit,—not later than May 1st. It concluded by requiring an acceptance of these terms within 30 days from date. The mines in question had been opened and operated to some extent for several years, and an extensive ore body had been developed, and was so exposed as to be capable of measurement, and the cubic contents calculated with reasonable certainty. The bill charges, in substance, that Van Deusen, who was an experienced miner and for many years in charge of the development and operation of this property, represented that the body of ore thus developed, and technically "in sight," amounted to 30,000 tons, and that "an average assay of the ore taken from different parts of the mine, so far as opened, showed thirty-five ounces of silver to the ton;" and that Van Deusen represented, as an inducement to the sale, "that his own estimate, based upon his own knowledge of the mine, was that the real average throughout the whole vein was not less than thirty-five ounces per ton." The bill charges that such a mine as thus represented, with suitable mills and machinery, would be very valuable and productive. The evidence submitted clearly indicates that the commercial value of such a mine, as it is charged this was represented to be, was not less than one-half million of dollars. The bill, in substance, charges that in point of fact the average richness of the ore body "in sight," and estimated at 30,000 tons, was inconsiderable. That the average of the whole exposed mass of ore was so low as to be worthless for milling purposes. It, in fact, charges that the defendants, from long and intimate acquaintance with the property and its history, knew, or ought to have known, that the average assay value of this developed ore body indicated so low a grade of ore as to make the average ore of no commercial value; that they knew that ore of value sufficient to justify milling existed only in irregular pockets or thin veins, and could only be obtained by the most expensive mining and careful selection; and that the mine, so far as known and developed, was commercially of no value. The preliminary correspondence between McDermott and each of the defendants, as well as the testimony of the parties, shows that McDermott was, before acceptance of the proposal of sale, to go personally to the mine, and be permitted every opportunity for examination and for sampling the ore body, and ascertaining for himself the truth or falsity of the representations made by the vendors as to the value of the property. The bill then charges that complainant McDermott went out to the mine for the purpose of availing himself of the proposal that he should be afforded opportunity to examine the mine, and take samples from the exposed body of silver ores for assay, by means of which he could intelligently exercise his own judgment as an expert as to the probable value of the large mass of ore in sight; that he went into the mine, and took therefrom a large amount of ore, broken from different parts of the mine, in such way as to thoroughly indicate the average grade of the ore in sight, and the characteristics of the ore; that he made a large number of assays from the samples thus taken, and procured other assays to be made from the same samples by other competent assayists; that the result of these assays showed that the average richness of the whole of the developed ore body, which his measurements and calculations proved to contain about 30,000 tons, was 34 ounces per ton. These results the complainants allege strikingly corroborated the representations of defendants, and indicated a property of very great value. These assays indicated that some 85 or 90 per cent. of the silver value of the ores consisted in native silver, which was found to be present in every sample in the form of finely divided particles, crystalline in character. The bill alleges that the high average of the assays was due to the presence of this native silver, "and was the essential fact upon which plaintiff McDermott determined to purchase the property, and he so informed the defendants." The bill then charges that, in reliance upon the fairness and representative character of the samples thus taken, the property was purchased. The whole of the money payment was made to defendant Watrous, the last payment being anticipated in order to secure title and possession. The deed was made to complainant Walter McDermott as trustee, the company for which he was acting not having completed its organization. Contemporaneously with the execution of the deed, a declaration of the trust upon which he held the deed, and substantially as stated in the proposal of

October 24th, 1887, was executed and delivered to Van Deusen. Subsequently McDermott conveyed the property to the Mudsill Mining Company, as under his trust he was bound to do.

The bill now charges that after the completion of the purchase, and after taking possession of the property, other samples were taken from all parts of the mine, as had been done before, with a view of certainly determining the kind of mill which was best adapted to the reduction of the ore. The assays of this sampling, made in February and March of 1888, demonstrated the startling fact that native silver did not exist in the ores of the mine, and that the average silver contents of the ores, consisting of chlorides and sulphides of silver, was less than seven ounces to the ton. This led to the opinion that the samples upon which the trade had been concluded had been tampered with by a process called "salting," and native silver in the form of fine powder injected into each of the bags containing samples. The complainants now charge that this sampling was done by or under procurement of the defendants, for the fraudulent purpose of deluding and entrapping complainant company into the purchase of a mine of no commercial value. This discovery that the mine contained no native silver in its ores was the result of the assays made upon the resampling done in February, 1888, and the conclusion was then entertained by complainants that the presence of native silver in the samples upon which the mine had been bought was the result of "salting." The formal demand of a rescission upon the ground of fraud was not made until April of 1889,—more than one year afterwards. Between these two dates the complainants put up a small mill, and reduced a large quantity of ore, and did much exploration and development work. To avoid the effect of this dealing with the property as an adoption of the contract, the bill alleges, among other things not now necessary to mention, that "all of the time from the moment that the plaintiffs found reason to suspect that they had been fraudulently drawn into the purchase of the property—that is to say, on or about the 25th of February, 1888—had been occupied in efforts to test the property, and fix beyond question its actual value, and to search for evidences of the fraudulent practices of the defendants, for the purpose of seeking the relief prayed for in this action." "Ever since it has had possession of the said mining property, the plaintiff company has prosecuted a thorough examination of it, and made repeated assays of fairly selected samples of the ores therefrom, with the result that the ores have been proven to be of an average value of about four ounces to the ton, and that there is no native silver in the ore vein." "Repeated attempts were made to induce the defendants to settle, on some equitable basis, the apparent difference between the represented and the actual value of the property." The bill prays (1) for a decree rescinding the contract of sale, and for a decree against the defendant for the entire sum of purchase money paid him, with interest; (2) that defendant account for all stock received and sold by him; (3) for general relief. The circuit court dismissed the bill.

Sidney D. Miller (John H. Bissell and Otto Kirchner, of counsel), for appellants.

Chester L. Collins (Benton Hanchett and T. F. Shepard, of counsel), for appellees.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

LURTON, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The evidence in this case is voluminous, covering more than 2,000 pages of the record. Any detailed statement of the testimony upon controverted questions of fact would be unprofitable, and extend this opinion to an unwarrantable length. The specific grounds upon which relief is sought are as follows: (1) That the defendants falsely and knowingly misrepresented the value of the

mine and the average silver contents of the ore "in sight;" (2) that the examination and sampling of the mine done by complainants was rendered abortive and misleading by the willful and fraudulent conduct of defendants in secretly and fraudulently procuring the admixture of native silver, which does not exist in the ores of the Mudsill mine, with the samples of ore taken by complainants from that mine; (3) that the complainants, in reliance upon the representations of the defendants, were, by their active fraud and deceit, led to purchase the mine in question, and part with their money in payment of the purchase price; (4) that the average silver contents of the ore "in sight" at time of sale has been by subsequent developments demonstrated to be less than eight ounces per ton, and the mine therefore of no commercial value whatever.

The evidence, in our judgment, thoroughly establishes that the representations made by defendant Stewart Van Deusen pending the negotiations for sale, and while acting for himself and the defendant Watrous, were, in substance, as follows: (1) That the ore body developed so far as to be technically "in sight" (meaning thereby ore-bearing rock so separated and blocked off by being worked around on two or more sides that it was subject to examination and measurement) was 30,000 tons. This representation was substantially confirmed by the examination, measurements, and calculations of complainants before the sale was consummated. (2) That the average silver contents of this 30,000 tons of ore was not less than 35 ounces of silver per ton.

It is perhaps too well settled to admit of controversy that a misrepresentation, in order to constitute fraud, must be an affirmative statement of some material fact, and not a mere expression of opinion. Gordon v. Butler, 105 U. S. 553; Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881. This distinction between the misrepresentation of a fact and the expression of an opinion is peculiarly applicable in the sale of a property so speculative and uncertain as a silver mine. In Jennings v. Broughton, 17 Beav. 234, which was a case brought to set aside the sale of shares in a mining venture on account of fraud in the sale, Knight Bruce, L. J., said:

"First, in the statements or representations concerning the mine, was there any untrue assertion material in its nature; that is to say, which, taken as true, added substantially to the value or promise of the mine, and was not evidently conjectural merely?"

The representations made verbally, and which it is alleged were false, related alone to the average richness of the exposed body of ore. Though in form the affirmation of a fact, yet, when applied to the subject-matter of the negotiation, it was in its very nature conjectural, and amounted to an expression of opinion. But this rule that a mere expression of an opinion will not constitute fraud must not be pushed beyond the reason for the rule. If a false statement is to be given immunity because it is mere "puffing" or "trade talk," and only the expression of an opinion, it is because the party to whom the opinion is addressed has no right to rely

upon the mere expression of an opinion, and is assumed to have the ability and opportunity of forming his own opinion and coming to an independent judgment. In speaking of the difference between the legal effect of a representation as to a fact and the expression of an opinion, Mr. Pomeroy says:

"The reason is very simple: While the person addressed has a right to rely on any assertion of a fact, he has no right to rely upon the mere expression of an opinion held by the party addressing him, in whatever language such expression be made. He is assumed to be equally able to form his own opinion, and to come to a correct judgment in respect to the matter, as the party with whom he is dealing, and cannot justly claim, therefore, to have been misled by the opinion, however erroneous it may have been." Pom. Eq. Jur. § 878.

If, therefore, the party making false statements as to a matter conjectural in its character, and therefore relating to a matter of opinion, actively intervene to prevent investigation and the discovery of the truth, and such intervention be effective in the concealment of the facts and in the deception of the buyer, a clear case of operative fraud is made out. In every such case immunity will not be extended to false expressions of opinion, upon the ground of "puffing" or "trade talk," if it appear that the vendor has, by his conduct, prevented investigation, and induced reliance upon the statements of the seller. In such a case the subsequent conduct of the seller in actively preventing the buyer from the formation of an independent opinion so connects itself with the original misrepresentation as to become part and parcel of the false statement, and amounts in law to the false affirmation of a fact. A false representation may, and most often does, consist in language alone, expressed or written; but it may also consist in conduct alone, or external acts. Whenever the purpose is to induce belief in the existence of a fact which does not exist, every word and act intended to produce conviction and induce action becomes a misrepresentation if, through their instrumentality, the party upon whom they are practiced is induced to act. 2 Pom. Eq. Jur. § 877. The gravamen of the alleged fraud lies in the allegation that when the complainants undertook to examine this property, and form an independent judgment as to its value, through the active and willful intervention of defendants, their samples were rendered untrustworthy by the secret admixture of silver in a form in which it did not exist in this mine; that the purpose was to give to these samples, otherwise representative of the average value of the ore in sight, a false and fictitious value, which would confirm the untrue statements expressed theretofore as to the silver contents of the mine. Now, it must be evident that, if this was done, a most abominable fraud was practiced, and that no court would suffer a contract resting upon such a foundation to stand. The evidence upon which it is sought to establish this fraud is almost purely circumstantial. We may assume that two important facts in the chain of circumstances are so thoroughly proven as to be treated as practically conceded—First, that in each bag of samples taken by complainant McDermott, and under his personal supervision, there was subsequently found a large per cent. of practically pure silver, in the form of a

very finely divided powder; second, that the ores of the Mudsill vein contained no native silver whatever. From these two facts the conclusion is inevitable that this native silver in the samples taken by complainants as representative of the exposed ore body did not come from the Mudsill mine, and was therefore an admixture operating to make the assay results obtained from those samples wholly unrepresentative and misleading.

Was the presence of this native silver in these samples accidental, or was it placed in the bags designedly? One or the other of these hypotheses must be true; no other can be suggested. Upon the hypothesis of accident what can be said? The doubt expressed in the opinion of the circuit court as to whether the metallic silver found by the assayist, Young, and by McDermott, was the product of the October samplings, is based upon the suggestion "that a week intervened between the test and the discovery of the metallic silver, during which the work of testing ores was carried on continuously in the ore-milling and testing works." There is not the shadow of a doubt engendered by the fact referred to. The intimation is that this fine silver powder might have accidentally gotten into the October Mudsill samplings from tests or assays of other ores which might have contained this form of silver. (1) There is not a particle of evidence that any other ore tested in the assay establishment of Mr. McDermott had shown the presence of native silver in that form. (2) Both McDermott and his assistant, the witness Young, say the discovery of this metallic silver in this form was a great surprise. It was to them an unusual occurrence. (3) The witness Young, whose testimony is referred to as suggesting the possibility of an accidental intrusion, by his statement that it was perhaps a week between the test and discovery of the metallic silver, says: "We never started another test until that was finished; we worked on one test until it was completed before we started another; in other words, we took one test at a time." (4) The history of the discovery of this metallic silver, as detailed both by McDermott and Young, completely explodes the suggestion. Its presence was not discovered in the assays. Silver in every form entered into the assay result, but no test for native silver was made in the earlier assays made by McDermott, Young, Arthur, Van Deusen, or Burlingame. After the ores had been sampled down,— that is, crushed, mixed, and divided and redivided to get small samples, representative of the larger ones,—the remainder not accepted or desired for assay purposes was used to make what are designated as "mill tests;" that is, the ores are treated precisely as they would be on a larger scale at a reduction mill. The crushed ores in this instance were first put through the stamp mill, by which they were reduced to a powder. A sample of the ore after it came from the stamp mill was assayed. The ores intermingled with a stream of water  then ran over the copper plates in the troughs, which carried off the lighter materials. The passing over copper plates was in this case accidental, as it was not usual to so treat silver ore in a milling test, and the plates had not been placed for that purpose. After the pulverized ore had been subjected to this washing, it was

again tested by an assay. These tests, made after passing over the copper plates, developed a very remarkable discrepancy between the assay of the pulverized ore before and after it had passed over the copper plates. This led to an investigation, which developed the fact that large quantities of metallic silver had been deposited on the copper plates. The fact of this discrepancy between the assay after pulverization, and before passing over the copper plates, and the assays after passing over the copper plates, led to the discovery of the native silver, and demonstrates the want of substance in any suggestion that the native silver might have been intruded from other samples by accident. (5) When complainant McDermott brought his samples from the mine to Fairplay, they were left in an ore-crushing mill belonging to the defendant Van Deusen overnight. The next morning some bags of the poorest class of ore were then crushed, and one sample of rich ore. These bags thus crushed were separately sampled down in the manner above indicated, and small samples from each lot obtained for assay purposes. These samples were then subdivided. One part was given to Arthur Van Deusen, a brother of the defendant Stewart Van Deusen, for assay; another portion was taken by McDermott to Denver, and given to Mr. Burlingame, an assayist in the public assay establishment in that city. Neither Arthur Van Deusen nor Burlingame tested for native silver, and neither reported any. The assays made by them were, however, highly satisfactory, and indicated that the poorest of the ore body was very valuable; the average silver contents in the six samples submitted to them for assay indicating an ore running about 27 ounces to the ton. Arthur Van Deusen's assays ran something higher. Burlingame did not assay the whole of the sample sent him, retaining, as is usual, a part as a means of verifying his first assay. These check samples were assayed afterwards by Mr. West, who found in them a large per cent. of native silver, corresponding in character to that found by McDermott and Young in the samples assayed or tested in New York. It is therefore demonstrable that, if the presence of native silver in these samples was due to accident, the accident occurred before the samples left Fairplay. (6) The hypothesis of an accidental admixture is weakened by the number of instances in which it must have occurred. If metallic silver had been found in only one or two tests or assays out of a large number, or it had been found in only one or two of the thirty or more samples from different parts of the mine, an accidental origin might seem possible; but when every test made on the October samples for the purpose of ascertaining its presence indicated a like "accident,"—when it was found in the samples taken from all parts of the mine and kept in separate parcels, and in all instances to represent from 80 to 90 per cent. of the total silver contents of each sample,—the theory of accident ceases to be believable, and the hypothesis of design is established. The frequency of the "accident" and the uniformity of its characteristics is contrary to all human experience, and justifies the utter rejection of the hypothesis of accident, and the acceptance of the only other possible theory, which is that it originated in design. Who was the designer? By

whose instrumentality was this admixture brought about? Here, again, we are without any affirmative testimony as to the perpetrator. If the hidden hand is to be discovered, it will be alone by the rightful use of a mass of circumstances in evidence which form the res gestae of a most mysterious and abominable fraud. All the evidence touching upon this aspect of the case is to be weighed in the scale of natural logic. "Each piece of evidence * * * is to have the weight attached to it by sound reason, unfettered by artificial rules." We know of no other way to try a question of fact dependent upon circumstantial evidence. Fraud, it is said, must be proven, and not presumed; yet fraud, like all other questions of fact, may be, and in most cases is, made out by circumstances from which the main fact is inferred. No witness has been introduced who testifies that he saw this metallic silver intruded into these bags of samples; yet circumstances so strong in their nature may be produced as to satisfy the mind and conscience that the guilty man is pointed out. As to the uses and character of circumstantial evidence, Mr. Sheldon, in his very valuable treatise upon the Science of Jurisprudence, has said:

"From whatever cause, the fact in question cannot itself be approached; but the surrounding facts, past, present, or succeeding, may have been seen, heard, or felt, either by the investigator, or by somebody else more or less likely to speak the truth about them. Circumstantial evidence is, then, the sort of evidence to a fact taking place which is supplied, not by anybody having observed it taking place, but by a number of other facts or circumstances having been observed which are held to furnish a legitimate ground for an inference from them to the fact in question."

We shall again resort to the hypothesis as a means of testing the evidential value of facts tending to discover the instrumentality by which these samples were "salted." "Hypothesis," to quote from Lindsay's translation of Uerberweg's Logic (section 134), "is the preliminary admission of an uncertain premise, which states what is held to be a cause, in order to test it by its consequences. Every single consequence which has no material truth, and has been derived with formal correctness, proves the falsehood of the hypothesis. Every consequence which has material truth does not prove the truth of the hypothesis, but vindicates for it a growing probability which in case of corroboration, without exception, approaches to a position where the difference from complete certainty vanishes. The hypothesis is the more improbable in proportion as it must be propped up by artificial auxiliary hypothesis. It gains in probability by simplicity, and harmony or (partial) identity with other probable or certain presuppositions." Subject to the conditions thus stated, the hypothesis has been of great value in the extraction of scientific truth, and, says Mr. Wharton, in his very scientific work upon Evidence, "is of no less value in the extraction of juridical truth." That author vindicates in a most satisfactory way the use of the hypothesis, and sums up his conclusion by saying that "juridical conviction may be therefore defined to be the fitting of facts to hypothesis. If, in criminal issues, there is reasonable doubt whether the facts fit the hypothesis of guilt, then there must be an acquittal. In civil issues, when there

are conflicting hypotheses, the judgment must be for that for which there is a preponderance of proof." Whart. Ev. § 14.

If we are right in the conclusion that the metallic silver found in McDermott's October samplings was not the result of accident, and is therefore attributable to a human agency, the admixture being by design, then there are two opposing hypotheses which cover every possible solution of the next step in this investigation. The first is that which the complainants must establish or fail in their case, and is, that the defendants, or one of them, or some one at their procurement, placed the native silver in the October samples taken from the Mudsill mine. The second, or opposing, hypothesis, is, that the admixture was done by some unknown person, and not with the procurement, knowledge, or consent of the defendants, or either of them.

The Motive. The first fact which tends strongly to support the hypothesis of guilt of the defendants is that they had a strong motive to induce such action. If Van Deusen's proposal was accepted, its results would be $110,000 in money, to say nothing of the use which could be made of the shares to be assigned them in the new corporation. How this money was to be distributed, and how it was in fact distributed, is left very indefinite by the evidence of the defendants, who could, if they had chosen, have made this very plain. This much we do learn, and that is that Stewart Van Deusen received at least $10,000, and probably much more, while Arthur Van Deusen, a brother, also received $10,000. This mining property, while owned by the East Leadville Mining Company, had been mortgaged for a loan of $8,000. Stewart Van Deusen induced the defendant Watrous to buy the claim thus secured. Arthur Van Deusen was the trustee under the mortgage, and Stewart Van Deusen was the owner of one-fourth of the stock in the East Leadville Company, and its resident general manager. Watrous was invited and urged by Stewart Van Deusen to buy in the property at the trustee's sale, which he did for the amount of his debt. Certain other debts of the company, in judgments and liens, also seem to have been paid off by Watrous to protect his title. The precise character and amount of these other debts is left in a very indefinite and unsatisfactory shape by the evidence of the defendants. The full facts were manifestly known to them. From what is to be gleaned from the guarded statements made as to these other debts, it is inferable that they amounted to but a few thousand dollars. Thus a property which had cost the East Leadville Company more than a hundred thousand dollars passed into the hands of defendant Watrous for perhaps not over 10 per cent. of what the Leadville Company had paid for and expended upon it. There is evidence that the company then owned personal property ample to have paid the claims through which Watrous acquired the property. Curiously enough, Stewart Van Deusen turns out to have some vague and indefinite parol agreement with Watrous, by which he is to share in the purchase with Watrous, or receive a share in the proceeds when sold. This share, according to Watrous, was to be subject to future adjustment, though Van Deusen

says, in one portion of his evidence, that the understanding was that he was to share equally. After the sale, Van Deusen remained in possession of the property, and continued the work of developing the mine, Watrous furnishing the money. A large part of the time of defendant Stewart Van Deusen was thereafter occupied in endeavoring to find a customer for the property. During this time he was supported by Watrous, who seems to have honored all of his drafts for his own support, as well as for expenses incident to the development of the mine and of a purchaser. All the obligations incurred in this way by Stewart Van Deusen were paid by this sale. Arthur Van Deusen was likewise deeply interested in a sale. He remained on and about the property, receiving during the time between the purchase of Watrous, in July, 1884, and the sale to complainants, in December, 1887, from his brother, as he states, but a few hundred dollars, but was to receive, in case of a sale, $150 per month from 1882 down to time of sale. Thus he was to be paid for about two years before Watrous bought the property. This is the way he accounts for his share in the proceeds of sale, which he says his brother paid to him in March, 1888. His own account of it is that he was paid in a check on Watrous' bank. He says: "Mr. W., my brother, and I walked to the bank, and they gave me the money." The circumstances attending the acquirement of this property—if it had any such intrinsic value as Van Deusen subsequently professed to believe—by Watrous for so insignificant a sum, coupled with the interest which the agent of the debtor company is developed to have had, furnish a strong presumption of a breach of trust by defendant Van Deusen towards the East Leadville Mining Company, and a reason for the placing of the title in Watrous with a parol understanding as to the interest the guilty trustee should thereafter have in the property. Watrous seems to have had no practical knowledge of this mine, and he probably entertained an honest opinion that it had great possibilities. The interest of Van Deusen was to make him think so, and he doubtless was not neglectful in this regard.

The effect of the proof in regard to the real opinion entertained by the defendant Van Deusen as to the value of this property leads us to these conclusions: (1) That he knew that the average silver contents of the ore "in sight" was nothing like so much as he represented it to be to complainants; (2) that he did entertain the opinion that the ore "in sight" might be profitably worked by a company with large capital, and supplied with extensive milling machinery, by which low-grade ores could be worked economically; (3) that he entertained a hope, natural to all connected with such enterprises, that further working and development might develop a higher grade of ores than those in sight. He had, since 1882, been intimately connected with this mine as manager. He was therefore not ignorant as to its past history, or as to any fact which could be discovered by examination or assays. He knew that the preceding owners, the McLean Mining Company and the East Leadville Mining Company, had expended more than $100,000 in developing and working the mine, with a yield of less than $5,000. He knew that ore

of a grade equal to that which he represented as the average of the whole ore body in sight had been found only in small pockets or thin streaks, and that the great body of the ore, in which was found an occasional pocket or a thin rich streak, was of very low grade. His own experience as manager, and with contractors, had been such as to leave him with no doubtful opinion as to the necessity of very careful selection of the rich ore from the poor ore, and that the ore of a grade equal to that which had been taken out and shipped to stamping mills was scarce, and that no reliance could be placed in a sufficiency of such ore being obtained to run even a very small mill. He knew that a mill erected at the mine would have to rely upon the average ore, and that it was of low grade, not approaching his representations as to its richness. Doubtless he entertained a hope that richer ores might be found, and that by economical processes the aggregate value of the ores, developed and undeveloped, if milled on a large scale at the mine, would ultimately prove profitable. Actuated in part by this hope of a richer development, wholly unjustified by facts connected with the past history of the mine, which would ultimately justify any representations he might make, he sought for a purchaser. His interest in getting his debts paid, his sharing in the cash to be received, and his hope that with plenty of capital the mine would prove profitable, furnished a powerful motive to mislead an intending purchaser as to the probable value of the mine he was undertaking to sell. The existence of a motive to perpetrate a crime or a fraud by no means establishes the complicity of the person having the motive. It is, however, an element for consideration.

The Opportunity. Did Van Deusen have an opportunity to mislead complainants by "salting" their samples? This is a necessary step in considering the hypothesis which presupposes his guilt. If he did not, then the hypothesis is worthless. McDermott occupied three days in examining this mine and taking his samples. The first day was spent in an examination of the mine as opened. He was accompanied by defendant Van Deusen. The next two days were spent in sampling the exposed ore body. He was assisted in this by two experienced miners, long in the employment of Van Deusen. His effort was to so sample the mine so that the average value of the 30,000 tons of exposed silver-bearing ore should be indicated. He therefore broke down the exposed surface clear across the exposed vein. This would, of course, include any rich streak, as well as the poorer ore within which it was embraced. He took his samples from many places in the mine, the total number taken being 31, making 33 bags of ore in all. As each sample was broken down, it was placed in sacks, described as ordinary sacks such as used for ore in Colorado. The material is described as "canvas and gunny sacks; chiefly canvas." The sacks were furnished by Van Deusen, and were branded in stencil, "Mudsill." In each sack was placed a paper with a memorandum showing the place in the mine from which it was taken. Each sack was then sealed up by complainant McDermott "by means of a twisted wire, which was passed through two sides of the sack, and twisted twice around the neck of

the same, then secured by means of small lead seal with two holes through it, which was forced onto the twisted wire by the pressure of a tool I had for the purpose of giving at the same time a clear impression on the lead seal, having upon it two letters, M. & D." These sacks, as thus secured, were left in the mine until the fourth day, when they were removed by wagon, accompanied by McDermott, to Fairplay, a village eight miles from the mine and on the railroad. The ore reached Fairplay after dark, and was placed for the night in an old crushing mill owned by defendant Van Deusen, where it was locked up. The next morning McDermott, accompanied by the two Van Deusens and the two men who had assisted in taking the samples, went to the mill. Eight of the sacks were opened, and there crushed in Van Deusen's mill for the purpose of obtaining assay samples. After taking twenty-five samples in the mine, McDermott took other samples as a check on those, and, as he states, for the special "purpose of determining the character of the rock and certain portions of the vein which appeared to be of very low grade," and which he says he "found could not contain value sufficient to pay for working." The twenty-five samples first taken, McDermott says, he regarded as fairly indicating the general average of the exposed ore. The last eight samples, with one exception, he regarded as representative of the poorer ores. Six of these eight samples last taken he decided to test before leaving the mine, "so that he could cable to London the prospects of the average samples." The samples thus selected for crushing in Van Deusen's mill, he says, represented, with one exception, what he was convinced was the lowest grade of ore in the mine. McDermott personally selected the sacks to put the crushed ore in, by turning them inside out and dusting them. The ore to be crushed was dropped by McDermott into the rock breaker, and from that dropped into a pair of crushing rollers, which reduced it so that no piece was larger than three-eighths of an inch cube. The ore as it fell from the crushing mill was received in the sacks prepared for it, "and each sample, as completed, was set out in the center of the floor by the defendant Van Deusen until the whole six samples had been crushed." Each sample was then taken by Van Deusen and McDermott, and spread on a large oilcloth and thoroughly mixed, so as to make a homogeneous mixture of the fines and the coarse resulting from the crusher. "It was then divided into four quarters, the two opposite quarters being thrown away until reduced to a size which could be handled on a special sampling machine, which consisted of a sort of charcoal shovel. One-half of the ore passed through between the solid portions of the shovel, the other remaining on it, so that one-half was retained in that way, and was thus reduced to about four pounds, representing a fair average grade of the whole 60 to 200 pounds of the original sample. This small sample was divided into two, and placed in paper bags." Each sample was separately crushed, and a small sample of each of the large samples obtained in the way above described by complainant McDermott. In this way six small samples were obtained in duplicate from the six large samples. One bag of each of the small sam-

ples was given to the defendant Stewart Van Deusen for assay by his brother Arthur Van Deusen. The paper bags of samples were numbered from 1 to 6. An assay was made at once by Arthur Van Deusen, the result being as follows: No. 1, 26 ounces per ton; No. 2, 30 ounces per ton; No. 3, 29 ounces per ton; No. 4, 27 ounces per ton; No. 5, 55 ounces per ton; No. 6, 40 ounces per ton. The six duplicates were taken by complainant McDermott to Denver, and were assayed for him by Mr. Burlingame. He reported the following results: No. 1, 11 ounces per ton; No. 2, 19.70 ounces per ton; No. 3, 25.50 ounces per ton; No. 4, 36.50 ounces per ton; No. 5, 42.70 ounces per ton; No. 6, 26.50 ounces per ton. Neither made any test for native silver, and neither reported any, though the check samples retained by Burlingame were, about the middle of March, 1888, assayed by Mr. West, who then found large quantities of native silver in them, corresponding in character to that found by McDermott in all his samples assayed in New York. On the strength of these assays McDermott cabled his associates in London his satisfaction with the outlook. The crushed ore not used was resacked and sealed. These sacks, together with the sacks of uncrushed ore, were left in charge of defendant Van Deusen, with directions to send the sacks of crushed ore by express, and the rest by freight, to New York. This was done, and they arrived there in due time, without any appearance of having been tampered with. In the subsequent testing of the ore thus shipped to New York, the presence of native silver was found to account for from 80 to 90 per cent. of the silver contents. This discovery was made late in November following.

The question we have to deal with is as to the opportunity afforded defendant Van Deusen to "salt" or have these samples "salted" before they passed from under his control. Complainant McDermott very frankly and confidently expresses the opinion that his samples had not been "salted" when the process of crushing began upon the morning after the ores reached Fairplay. He bases his opinion upon the appearance of the sacks, and upon the more important fact that the ore he there crushed was in lumps, and that as he took each lump out of the sack "he dusted it off" to remove the fine particles before dropping it into the rock breaker. His judgment is that this would have removed any silver in such a powdery form as that subsequently discovered. Accepting this conclusion, it settles the fact that the ores had not been tampered with either at the mine or at the mill the night before, and we need not consider the opportunities afforded the defendants of access up to the time that McDermott began the crushing of certain of his samples the day after they reached Fairplay. Between the time that the process of crushing began and the completion of the preparation of the small samples was there an opportunity to have placed this powdered silver in the ores crushed? Undoubtedly, there was. About one-half of the area of the mill floor was under an upper floor, open in front, so that the floor of the mill not under this upper floor or platform was open to the view of any one on the upper floor. McDermott's bags of samples were on this

platform or second floor. The mouth of the rock breaker was on that floor. On that floor McDermott stood, putting his samples, rock by rock, into the crusher. The samples went into the crusher on one floor, and came out of the hopper on the floor below, at a point not within the observation of McDermott. On this lower floor the crushed ores were received by the defendant Van Deusen, who, as each sample was crushed, would unhook the bag into which it fell as crushed, and set it out on the mill floor at a point within the observation of McDermott. While the defendant was engaged at the lower extremity of the crushing machinery, he was not, by the great weight of the evidence, within sight of McDermott, who was feeding the mill above. During this opportunity it was altogether possible to clandestinely place enough metallic silver in each bag to greatly increase the apparent value of the sample. After the six samples were crushed, the entire lot of crushed and uncrushed ore passed from under the observation and control of McDermott, and was left in the care and custody of the defendant Van Deusen for shipment. Thus he was afforded access to the bags of uncrushed ores, and with proper means could, before the shipment of these bags, have added to each sample such quantity of native silver as, with the natural silver contents, would bring its gross silver value up to a value corresponding with his representations.

The Means. The material used for "salting" was a finely divided form of metallic silver, resulting from the precipitation of silver held in solution. The particles were nearly as fine as flour, though under the microscope they were crystalline in character. The process for the reduction of silver ores employed by some reduction mills involved the production of just such a powder as one stage in the reduction to bullion. This was notably the case at the Boston & Colorado Smelting Works, at Argo, Colo. Just such a form of silver could be bought from that company, and was in fact bought and produced in evidence in this case. This silver, mixed with the crushed or uncrushed ore, would by contact lose its brightness, and take on the color and stain of the sample. In that condition its presence could only be detected by a microscope or a test made, having such a discovery in view. Its general resemblance to crystalline native silver found in some silver ores was such as not to excite any suspicion. An ounce of this powder mixed with a hundred pounds of the average ore of the Mudsill mine would operate to add twenty ounces per ton to the apparent silver contents of such ores. But a moment was needed to empty the required quantity of this material in each sack of ore as it was taken from the lower end of the crushing rollers by defendant Van Deusen. The unopened sacks could have been "salted" by forcing the point of a syringe or funnel through the meshes of the coarse canvas sacks, and squirting the fine silver in and upon the contents. The subsequent crushing and mixing intended to distribute the coarse and the fines, the richer and the poorer ores, as evenly as possible, would operate to distribute this foreign material more

or less evenly through the mass. That in the handling of the bags during shipment some part of this fine metal might have escaped through the sacks is possible. That enough remained to make these samples worthless as representative of the ore body was subsequently made most evident.

It is manifest from the foregoing that the defendant Van Deusen had a powerful motive to induce such an admixture, and that the opportunity and means existed, if he chose to avail himself of them, to accomplish his end. While other persons had the same opportunities and access to the same means, the defendants alone had any motive or interest in "salting" these samples. The interest of complainant McDermott was to get at the true value of this property. He was buying for himself as well as for others, and no possible motive is suggested which would account for his complicity in such a fraud. It is possible that some one, from enmity to him, or those with whom he was acting, might have sought a mean revenge in this way. Such a possibility is not to be seriously considered when there are no facts shown indicating the operation of such a cause. Having established that this metallic silver was, by design, placed in these samples, the hypothesis propounded by the complainant—that the defendants were the designers—is supported by these circumstances (1) that they had a powerful motive inviting just such a fraud; (2) that Van Deusen had access to the samples at a time antecedent to the first assays made from them; (3) that the means necessary to the commission of the fraud were accessible to them; (4) that no other person or persons had any motive or interest in committing such a fraud; (5) no one could hope to profit by the admixture, other than the defendants.

We shall not stop now to consider the probative effect of these facts in establishing the hypothesis presupposing the guilty agency of the defendants. There are other circumstances entitled to consideration before a conclusion is reached. Pending the purchase, defendant Van Deusen informed complainant McDermott of three examinations and samplings other than that by Rathbone, made for intending purchasers by disinterested mining engineers, and also of the assay results from those samplings. The examinations referred to were those made by John B. Farrish, Ridley and Stanton, and a man named Jacobs. Farrish's report showed, as McDermott stated, 30,000 tons of 30-ounce ore in sight. In this connection he said that Farrish's estimate was a little lower than the actual average, and that 35 ounces would be nearer. Subsequently, when McDermott embodied this statement as to Farrish's report and examination in a prospectus for the new company, Van Deusen corrected him, in a letter dated November 19, 1887, in which he said that Farrish had told him that there was 50,000 tons of ore in sight, of an average value of 40 ounces of silver to the ton. He represented Ridley and Stanton as reporting 40,000 tons of 45-ounce ore. This, too, was corrected and enlarged in the letter referred to, so as to raise the ore in sight to 57,000 tons. The Jacobs report he said showed 50,000 tons of 50-ounce ore. This is changed by his letter to 46,000 tons.

The confidence placed in these statements of former estimates and assays is indicated by the fact that McDermott embodied two of them in the proposed prospectus for the new company, prepared while en route from the mine in October, 1887, and embodying the conviction then entertained by him as to the value of the property from all he had heard and seen. Evidence has been introduced tending to show that one of these reports, and possibly a second (of the three mentioned above), which found a place in McDermott's prospectus, were the product of frauds of like character to that charged in this case. Its competency for this purpose will not admit of controversy. If defendant Van Deusen used these reports for the purpose of inspiring confidence in the value of this mine, and in the truth of his own representations as to its value (about which we have no doubt), then it was competent to show that these reports had their own origin in fraud concocted and executed by the man who thus pretended to rely upon them as bottomed upon representative ores of the mine he was trying to sell. It is likewise competent as tending to sustain the hypothesis presupposing the agency of defendants in corrupting the samples taken by complainants. That defendant Van Deusen interfered with samples taken by other intending purchasers does not of itself prove that he was guilty of like conduct in subsequent efforts to sell; but, when subsequent samples are shown to have been tampered with by somebody unknown, the fact that defendants, in former efforts to make sale of the same property, had resorted to just such frauds in order to sell, becomes competent and cogent evidence tending to establish their complicity in the like fraud now under consideration. Did they believe that they had a valuable property? Did they believe it was of the value they represented it to be? Were they acting in good faith in holding this property out as having a great commercial value? Or, on the other hand, did they believe the property could only be sold by giving it a fictitious value through the means of fraudulent samples? Their former efforts to make a sale by resorting to fraudulent interferences with the samples taken by experts acting for possible buyers so connect themselves with the last effort to make a sale as other acts in furtherance of the same general design. It is not, in such a case, essential that these former acts of fraud were not contemporaneous with the transaction under inquiry. If they were frauds of like character, and especially if they concerned former efforts to sell the same property, they are admissible. Remoteness in point of time may weaken their evidential value, but will not ordinarily justify exclusion. The case of Hoxie v. Insurance Co., 32 Conn. 21, is directly in point. There the court said:

"Upon the question of good faith, knowledge, or intent, any other transaction from which any inference respecting the quo animo may be drawn is admissible; and where fraud is imputed, and within the issue, and provable by various circumstances, a considerable latitude must be indulged in the admission of evidence. * * * It has sometimes been thought that the other transactions should be contemporaneous, or nearly so; but that is not essential. A fraudulent combination and fraudulent motive may be inferable from a series of successive transactions of a fraudulent or suspicious character and in respect to such a subject-matter."

Ross v. Miner, 67 Mich. 410, 35 N. W. 60; Rafferty v. State, 91 Tenn. 655, 16 S. W. 728; Bottomley v. U. S., 1 Story, 136, Fed. Cas. No. 1,688; Jordan v. Osgood, 109 Mass. 461; Castle v. Bullard, 23 How. 174; Butler v. Watkins, 13 Wall. 457; Insurance Co. v. Armstrong, 117 U. S. 598, 6 Sup. Ct. 877; Blake v. Assurance Society, 4 C. P. Div. 94.

In the case last cited, Lindley, J., said:

"I agree that, in order to prove that A. has committed a fraud on B., it is neither sufficient nor even relevant to prove that A. committed fraud upon C., D., or E. Stopping there, I admit that proposition; but, let it be shown that the fraud on B. is one of a class of other transactions having common features, then I disagree altogether with that proposition."

The testimony admissible upon the principles above stated is that of the witness Wardle, who was railroad and express agent at Fairplay from March, 1883, to October, 1886. That witness testified that, upon three several occasions, bags of ore samples in the depot at Fairplay for shipment, and being samples taken by experts for possible buyers, were tampered with by the defendant Stewart Van Deusen and his brother Arthur Van Deusen, assisted by witness. These cases occurred in 1884 and 1885. The first lot of samples as to which he testifies he describes as having been taken by a Mr. Loth, in the summer or fall of 1884. Loth's samples were in the depot in bags, tied with cords. The sacks were untied, and other ore, previously put in the depot by the Van Deusens, was substituted for ore taken from the bags. The second instance occurred afterwards. The name of the expert taking the samples was not known to the witness. The bags had been tied and sealed with ordinary sealing wax, stamped, as if with the back of a knife blade, with three straight lines. The seal was broken, the bags untied, and the substitution of one ore for another was made, and the original seal duplicated. The third instance was with reference to the lot of samples taken by J. B. Farrish in the fall of 1885. The samples were in small bags, inside a large one. The big sack was fastened and sealed with wax stamped with the letter F. The small sacks were sealed the same way. These sacks were opened at bottom, an exchange of part of the contents made, and again sewed up. Witness says that defendant Van Deusen explained that this substitution was in each case made to improve the average and induce a sale. The testimony of one who admits himself an accomplice is, of course, to be cautiously received. The character of the witness is also attacked by evidence going to his general reputation. He is, on the other hand, supported quite strongly. His evidence has been carefully scrutinized. It contains many inherent marks of honesty. It accounts for high averages obtained by former examinations, which, in the light of the history of this mine, and the other facts of this case, would be inexplicable. The testimony fits into the surroundings so much like truth that we are led to accept it as worthy of consideration.

The conduct of the defendant Van Deusen after the discovery of metallic silver in McDermott's October samples has been relied upon by the complainants as full of suspicion, while the defendants, on the other hand, claim to find in it very high evidence of

innocence. We think it is explained by a consideration of the very embarrassing circumstances incident to the unexpected discovery of the native silver in those samples. If it be assumed that he had a guilty agency in the matter, was there anything in his conduct which tends to corroborate or weaken the assumption? Mr. Van Deusen could well assume that it was not likely that the presence of native silver in McDermott's samples would be discovered. Neither Burlingame nor Arthur Van Deusen reported any such discovery. Very many assays were made by McDermott and Assayist Young without its presence becoming known. The accidental presence of some copper plates in a milling test produced a precipitation of the metallic silver upon the plates. A discrepancy between assay results before the powdered ore passed over these plates of copper resulted in a "clean-up," and the discovery of the precipitated silver. This discovery was a surprise to Van Deusen, and his whole after conduct was influenced by the necessity of confirming McDermott's opinion as to the gross contents of the ores in the mine, while preventing him from putting up a mill built with a special view to the saving of free metallic silver by the screening process. This antagonism in the ends he sought was the result of McDermott's discovery that from 80 to 90 per cent. of the silver contents of the ore could be cheaply and certainly saved by a screening mill instead of an amalgamating mill. The proposal for a sale required the buyer to at once erect a 20-stamp mill with frue vanners. Such a mill was more expensive, and not so economical in its operation as a screening mill. If, as McDermott's samples showed, the average silver contents of the Mudsill ores was 34 ounces of silver per ton, and if, as his tests demonstrated, 80 per cent. of the silver contents was in the form of metallic silver, and could be saved by screening, then it was clear that a mill adapted to screening the ore, and thus eliminating the free silver, was the proper mill to put up. Now, if Van Deusen knew that the metallic silver found by McDermott was a foreign intrusion, he knew that a screening mill would be worthless. We have, in a former part of this opinion, stated that the whole body of this evidence convinced us that while Van Deusen knew that the average silver contents per ton of the ores in sight was nothing like so good as he represented, yet he did entertain the opinion that with a large stamp mill, such as he required the purchaser to put up, and plenty of capital, the ores of the mine might be profitably worked, and, moreover, there was a prospect of discovering higher-grade ores by the further development of the mining claim. The greater part of the nominal consideration for the mine was to be paid in shares of the new company, which shares he was to take. Entertaining these views, he could do nothing which should shake McDermott's confidence in the average silver contents, as indicated by his tests and assays. Yet it was essential to his own future interests that the kind of a mill required by the contract should be put up, and not a screening mill, as desired by McDermott. The role he had to play was a difficult one. It led him to feebly and qualifiedly express doubts

as to the existence of native silver "in paying quantities;" it led him to state that his own experience in screening had been unsatisfactory; and yet all this was done and stated in such a way as to assume the character of a mere difference of opinion as to the kind of mill adapted to these ores. He soon learned that McDermott's confidence in the representative character of the samples he had taken was absolute. He also early learned that his confidence in the gross silver contents per ton of the ore in sight, as shown by his assays and milling tests upon those samples, was equally strong. To McDermott it was a clear case that his samples had been "salted," or his results were reliable, and he put it in this way to Van Deusen, stating in a letter to him that nothing could prevent his going on with the purchase of the mine unless, by a new examination, he should be convinced that his samples had been "salted." His confidence in Van Deusen was manifested in an extraordinary manner, for he said in his letter of January 4, 1888, to him, that, if he (Van Deusen) thought the salting possible, he should so telegraph him to visit the mine again. This mark of confidence so strengthened Van Deusen's confidence in the success of his game that he responded by replying, in substance, that he had every confidence in the future success of the mine; that, if he (McDermott) entertained any suspicion that all was not right, he should have no hesitation in giving up the sale; that, if he concluded to go ahead, then to so telegraph Watrous, etc. This letter had the effect anticipated. It confirmed McDermott in his faith, and he did not go to the mine. He did make two efforts to get other samples sent to him, taken from points he indicated in his letter. These samples were not for the purpose of reconsidering the question of the average value of the ore body. That question he treated throughout as settled by his former sampling and the resulting assays. He wished the other samples to settle the question as to the kind of mill. But to do this he wished and directed Van Deusen to send him samples which would be characteristic, and directed the places in the mine from which they should be taken. If he had obtained what he requested, he would have gotten average samples representing the whole body of ore in sight. This would have certainly led to the discovery of the poverty of the ore, and have shown that native silver did not exist in the mine. This result was deliberately defeated, for in each instance he was sent selected ore, running way above the average, as shown by even the "salted" samples. The defendant Van Deusen carefully informed him in each case that the ores were from the points indicated, but were selected ores. The excuse given for sending them was that they were characteristic of the kind of ores which the mill would have to reduce. These samples, of course, showed no native silver, and were calculated to aid Van Deusen in his effort to prevent the putting up of a screening mill, and yet not calculated to shake McDermott's opinion as to the average silver contents of the ores in sight.

When the trade was concluded, December 8, 1888, and part of the price paid, it was upon a private understanding that he (McDermott) was to have further samples for the purpose of determining the kind

of mill, and that if, upon these other samples, he was not satisfied, he might withdraw at any time before March 1st,—the date when the last payment was to be made. We have detailed his efforts to get further average samples and the results of those efforts. The interpretation put upon this agreement by both the defendants was such that the right of resampling had been fully permitted by the sending of the samples we have above alluded to. McDermott's efforts to get further ore, he not being entitled to possession until all the purchase money was paid, were absolutely refused by Watrous; Van Deusen explaining that Watrous felt that the private understanding as to the right of withdrawal might be affected if further sampling was permitted. The effect of this conduct was not to arouse suspicion, but to lull McDermott into confidence. This is evident from his telegram of January 7, 1888, to defendant Van Deusen, in which he said:

"Your brother telegraphs cannot ship ore without order of Watrous. This seems unnecessary blocking of progress. Forces me to decide on mill without more tests. Shall simply hurry Watrous' payments and take chances of process. Does Watrous no good."

Subsequently, Watrous relented, and authorized Arthur Van Deusen to send the samples wished. McDermott had written for average samples, saying that the rich samples sent before by Stewart Van Deusen would not enable him to settle the problem as to kind of mill. The result of this was a second lot of very rich selected samples. Whether they came out of the Mudsill mine at all is, on the evidence, somewhat in doubt. Mr. Tobin, the chairman of the complainant company, came over to America in February following. McDermott applied to have the right of withdrawal renewed so that Tobin, after examining the mine, could accept or reject. He was informed that this was unbusiness-like, and refused. To get possession was necessary to settle the question of kind of mill to be put up. To do this the last payment, due March 1, 1888, was anticipated, it being made February 15th. Possession was then taken, and a re-examination and resampling made with a view of settling the mill question. These samplings and tests resulted in the discovery that there was no native silver in the mine, and that the average value of the ore in sight was probably so low as to be commercially valueless. Many other details might be given, tending to the conclusion that the conduct of defendant Van Deusen, after he learned of McDermott's discovery, was not that of an innocent man. If he had been free from complicity in this matter, and honest in his opinions and purposes, he would have said to McDermott: "Your tests and assays are all wrong, or your samples were 'salted.'" Knowing, as he did, that there was no native silver in the ores of this mine, he would have realized that McDermott was mistaken, or his samples had been tampered with. One conscious of an honest purpose would have demanded a re-examination and a resampling, instead of throwing obstacles in the way.

To sum up our conclusions upon this branch of the case, we have, in support of the hypothesis presupposing Van Deusen's guilty agency in this matter, the following: (1) That the samples were not

accidentally "salted." (2) If not by accident, then they were "salted" by design. (3) Van Deusen had a motive prompting a line of conduct which would support his untrue representations. (4) He had the opportunity, and the means were accessible. (5) No other person had a like motive, and no one could profit by the fraud except the defendants. (6) He knowingly misrepresented the average silver contents per ton of the ore in sight, for the purpose of thereby inducing a sale. Though these misrepresentations were, in effect, the expression of an opinion, yet the opinion as expressed was put in form of fact, and was not honestly entertained. (7) There is evidence of former acts of fraud of like character to that now charged, and with reference to the same subject-matter, indicating a systematic scheme of fraud by which a sale of this property was purposed to be brought about. (8) The conduct of the defendant Van Deusen after the discovery of the fraud was calculated to lull the complainants, and was such as indicated a fraudulent purpose. The whole body of the proof generates a strong conviction that the defendant Van Deusen directly, or through his agents, corrupted the samples relied upon by complainants. We use the word "proof," in the foregoing sentence, in its broad and comprehensive sense, and as embracing, in addition to evidence, all those grounds upon which may rest a juridical conviction, including facts, circumstances, and presumptions of fact which result from evidence of other facts. Upon the "proofs" adduced, we find sufficient reason for assenting to the hypothesis presented by complainants. While we recognize that, in the absence of direct evidence of the principal fact, there is a possibility that this metallic silver found its way into complainants' samples by accident, or through the intervention of some agency beyond the control of defendants, yet the weight of the proof so decidedly preponderates upon the side of the hypothesis presupposing the guilt of the defendants that it brings about that degree of conviction necessary for judgment in a civil case. The denial of Van Deusen, as a witness, of any complicity in this "salting," cannot shake this conviction. He does not, and cannot, explain how it otherwise happened, and a mere negative fails to shake the evidential force of the proof which points to his guilt.

The defense of accord and satisfaction has been suggested, rather than pressed. After the purchase money had been all paid, and after complainants had taken possession, they resampled the mine with a view to settling the character of the mill which should be put up. The contract required a 20-stamp mill of expensive character. As before shown, McDermott's discovery that from 80 to 90 per cent. of the silver contents was native silver led him to the conclusion that a mill adapted to the reduction of an ore from which so large a proportion of its silver contents could be taken by screening was the mill needed. We have before shown that Van Deusen, the largest stockholder in the new company, opposed this kind of a mill, and stood upon his contract. His reasons for this attitude we have before considered. So far did he go in his insistence that he privately offered to McDermott personally 2,500 shares of the Mudsill stock if he would give up the idea of a screening

mill, and at once carry out the contract. After the assay of the samples taken in February had satisfied McDermott that there was no native silver in the Mudsill ores, and induced a belief that his samples had been "salted," he was confronted with the agreement with Van Deusen, requiring the immediate erection of the mill provided for in the declaration of trust executed December 8, 1887. The belief that a fraud had been practiced had not yet acquired the solid foundation of knowledge. The complicity of the defendants in the "salting" remained to be established by evidence. It was, upon consultation with Mr. Tobin, deemed best to say nothing about their suspicions. Opinion of counsel was taken as to the effect of the agreement with Van Deusen as to erection of mill. They were advised that the contract was imperative. McDermott informed Tobin of Van Deusen's former proposition to give him 2,500 shares if he would go on with the stamp mill. It was deemed very desirable to get the contract so modified as to allow the erection of a smaller mill in the first instance, to be followed by a large one if the results should justify it. It was also agreed that no charge of fraud should be intimated. To accomplish these purposes, Tobin went to see Van Deusen. The result was a modification of the agreement as to the mill, and a concession to the company of the shares offered McDermott. That agreement was, as stated by Van Deusen in a letter to McDermott, in these words:

"Dear Mr. McDermott: Mr. Tobin arrived here this a. m., and I have had a very full talk with him regarding the programme of work at the Mudsill mine and the most judicious expenditure of the capital of the company. Understanding you have stopped the erection of the sizing mill, we have agreed, in substance, as follows: I agree to allow you to, and Mr. Tobin agrees that you shall, at once erect a five-stamp mill; and I therefore authorize you to build such a mill at once, complete with true vanners and amalgamating pans; and in consideration of this agreement to build such five-stamp mill complete, and agree that the erection of a larger mill may be postponed until the value of the mine has been proved by this five-stamp mill, by crushing at least two thousand tons of at least twenty-ounce ore, though you and the company have the power of building a larger mill at earlier date should you think advisable, and as Mr. Tobin wants to make sure that the company does not run short of capital for further development of the mine, and to assure the company, I have further agreed with him as follows: 'I hereby authorize you to transfer to the company two thousand five hundred of the shares you are to receive from the company on my behalf, as bonus given by me for the benefit of the company; and I further hereby authorize you to transfer to the company seven thousand five hundred of the shares of the company which you are to receive on my behalf, on condition that the company undertake to return to me the seven thousand five hundred shares, or the proceeds thereof, at the par value of the same, at the option of the company, on the payment of the first dividend made by the company, or as soon as the company shall have made a net earning of ten per cent. for one year on its capital stock.'

"Yours, truly,　　　　　　　　　　　　　　　S. A. Van Deusen."

This was satisfactory to Tobin and McDermott, and the erection of a five-stamp mill begun. The board of directors of the complainant company, upon being advised of the agreement, repudiated it, and refused to accept the shares thereby offered, fearing its effect in case the facts should develop that the company had been defrauded. The proposed agreement had no element of an accord and satisfaction. It related only to the contract concerning the

mill to be put up, and was an agreement inter sese; that is, between the company and one of its shareholders. Its rejection by the company when submitted to it is, however, conclusive.

There remains to be considered the question as to whether the demand for rescission was made in time, and suit prosecuted without laches. When a purchaser acquires knowledge that he has been defrauded, he has an election of legal remedies. He may keep the property and sue for damages, or repudiate the contract and demand rescission. These remedies are not concurrent, but inconsistent, and the adoption of one of necessity excludes the other. The rule is well settled in equity that after knowledge of the fraud the party must, within reasonable time, make an election as to whether he will affirm the trade, notwithstanding the fraud, or offer to restore the property and demand the return of his purchase money. If, after the knowledge of the facts which entitle him to rescind, he deal with the property as owner, it is evidence of acquiescence and an affirmance of the contract. The authorities to this point are numerous, and the principle well settled. The more important cases are: Pence v. Langdon, 99 U. S. 578; Johnston v. Mining Co., 148 U. S. 370, 13 Sup. Ct. 585; Oil Co. v. Marbury, 91 U. S. 587; Upton v. Tribilcock, Id. 54; Cobb v. Hatfield, 46 N. Y. 533; Schiffer v. Dietz, 83 N. Y. 308; Lawrence v. Dale, 3 Johns. Ch. 23; Tanner v. Smith, 10 Sim. 411; Gilbert v. Hunnewell, 12 Heisk. 293; Oakes v. Turquand, L. R. 2 H. L. 325. But, before a purchaser is compelled to elect whether he will affirm or disaffirm, he must be aware of the facts which raise such an election. Delay will not defeat his right to relief, unless the fraud was known to him, or ought to have been known by due diligence. In Pence v. Langdon, 99 U. S. 581, Mr. Justice Swayne, in discussing a question of alleged acquiescence in a fraud, laid down what we deem the true rule upon this question. He said:

"Acquiescence and waiver are always questions of fact. There can be neither without knowledge. The terms import this foundation for such action. One cannot waive or acquiesce in a wrong while ignorant it has been committed. Current suspicion and rumor are not enough. There must be knowledge of facts which will enable the party to take effectual action. Nothing short of this will do. But he may not willfully shut his eyes to what he might readily and ought to have known. When fully advised, he must decide and act with reasonable dispatch. He cannot rest until the rights of third persons are changed. Under such circumstances, he loses the right to rescind, and must seek compensation in damages. But the wrongdoer cannot make extreme vigilance and promptitude conditions of rescission. It does not lie in his mouth to complain of delay, unaccompanied by acts of ownership, and by which he has not been affected. The election to rescind or not to rescind, once made, is final and conclusive. The burden of proving knowledge of the fraud and the time of its discovery rests upon the defendant."

The contention of defendants that complainants have waived their right of rescission is based upon the admission of Mr. McDermott, in his evidence, as to the effect upon him of the results of the assays upon the resampling of the mine after complainants took possession, in February, 1888. He says from that time he believed his samples had been "salted." The question as to whether the defendants were responsible for that "salting" was

not settled by that discovery alone. His belief in their complicity was not necessarily evidence that he had knowledge of facts which would justify the charge or support a demand for rescission. The witness, in other parts of his evidence, draws a distinction between his belief in the fact of "salting" and his conviction that the evidence connected the defendants with it. When asked the direct question as to when he became fully persuaded in his own mind that the defendants were responsible for the fraud, he says: "It was a gradual growth of conviction, as I collected the evidence. I don't know that I can specify the exact date when I was able to fasten it upon them in my own mind." The fact that misrepresentations had been made as to the average value of the exposed ore body, and that his resampling had shown such results as to make the untruthfulness of these representations probable, was not the discovery of a fact which, by itself, put him to an election. This we have already ruled. Those misrepresentations were in the nature of an opinion. Without evidence that his samples had been tampered with by defendants, he had no knowledge of facts entitling him to rescission. Knowledge of their guilty complicity in the intrusion of metallic silver was and is the knowledge upon which the option of rescission or adoption arose. The knowledge which would have required prompt action was knowledge of facts convincing as to the agency of defendants in imposing on him fraudulent samples. Neither rumors nor suspicion required an election. Either would demand diligence in effort to discover the truth, for, after facts are known calculated to excite suspicion, laches would be imputed if there was negligence in inquiry. That an advantage had been obtained by reason of the unfair character of the October samples was not enough to justify rescission. In defining fraud, Mr. Pomeroy calls attention to the necessity that the undue advantage acquired should be the result of willfulness. He says:

"Every fraud, in its most general and fundamental conception, consists in obtaining an undue advantage by means of some act or omission which is unconscionable; or 'a violation of good faith' is the broad meaning of the term in equity,—the 'bona fide' of the Roman law. Furthermore, it is a necessary part of this conception that the act or omission itself, by which the undue advantage is obtained, should be willful,—in other words, should be knowingly and intentionally done by the party. The willfulness of the act or omission is the element which distinguishes fraud from other matters by which undue advantage may be obtained so as to furnish an occasion for the equitable jurisdiction." 2 Pom. Eq. Jur. 353, 354.

It was, therefore, essential that complainants should be aware of the fact that the "salting" had not occurred by accident, or through the intervention of agencies beyond the control of defendants, but by and through their responsible instrumentality. If, after knowledge of this fact, complainants dealt with the property as owners; if, after knowledge, they experimented with the property, that they might see whether to keep it or throw it up,—then they have waived their right of rescission, and must rely upon other remedies for relief. That complainants had no purpose to hold onto the property for the purpose of ascertaining whether it would be most profitable to adopt or rescind is made most manifest by their efforts to induce

defendants to take it back.    (1) On February 27th, immediately after the result of the resampling was known, McDermott wrote Watrous, stating the result of assays, and his great disappointment. He said most of his friends had taken shares upon his original sampling and assays, showing native silver; that they might wish to withdraw,—and proposed that he should take 20,000 shares at par, as he had proposed to do only a month before, and let such of his friends withdraw as should desire, in view of the changed aspect of affairs.    He wrote Van Deusen to the same effect, and offered to abandon all private arrangements between them.    This proposition was declined upon the statement that other investments had been made.    On May 10, 1888, he again wrote defendant Watrous, in which, after stating certain facts as to his inability to get a resampling before payment of all the purchase money, his purchase on the results of the October assays, and subsequent discovery that the mine contained no native silver, he concluded by saying:

"I have given you this full statement so that you will understand my sudden change of views about the purchase, and my desire to withdraw from the same before the mine is worked or the mill started.    The company has built a complete stamp mill, with concentrators and pans  of a capacity of 10 tons daily, which is arranged for quickly doubling its capacity by addition of stamps.    This mill will be ready to start early in June.    We have practically done nothing in the mine since my last visit.    My proposition is as follows: You have written your very favorable opinion of the property, and expressed a willingness to work the mine and build a mill yourself rather than grant a few days extra time for resampling by me last November.    I have done nothing to the mine to change its value, and have nearly completed a very effective mill, such as Mr. Van Deusen knows is adapted to the treatment of the pay ore.    I offer now to return the whole property as assigned to me, together with the mill site and Kentucky lode claim, since acquired, and with a completed mill ready to start.    With the property I turn over supplies and tools, cars, track, boarding-house outfit, telephone line, etc., on which, in all, over $1,000 has been expended; you to return cash paid you, $110,000.    In other words, you get your property back as a going concern, ready to produce, and enhanced in value above what it was when you sold, by the amount of our expenditures, say fully $20,000, and before a stroke of work has been done to in any way change the value of the mine.    Should you consider the proposition favorably, I will at once cable London for a meeting of stockholders to be called to decide whether the company will accept terms I offer.    An immediate answer is necessary, because, if you refuse to consider the offer, we must actively push work at the mine to get ore out for the mill, and this present offer is entirely disconnected with any ultimate success or failure in working, but rests simply on the facts surrounding the purchase by me.    I have the authority of the board of directors to open this negotiation, subject to shareholders' approval, since property has been deeded to company now, and some shareholders have purchased stock above par considerably.    Begging the favor of an early reply, and hoping that you will see the proposition in a favorable light, I remain, yours, truly."

This proposition was absolutely declined by letter of May 16th. We think that these proposals demonstrate that complainants have acted in the utmost good faith, and remained in possession of the property only until they learned facts which would justify a demand for rescission.    In Pence v. Langdon, supra, it was expressly decided that, where the defense of acquiescence or waiver is set up to defeat rescission for a fraud, the burden is upon defendants to make it out.    This burden has not been discharged.    The suspicions and opinions entertained by complainants were not knowledge of

the facts necessary to require election. Facts enough were known to require diligence in inquiry from and after the February assays. The record is full of evidence indicating that in this duty there was no slothfulness. Detectives were employed. A small mill was put up, and mill tests made upon several hundred tons of ore, by which it was clearly shown that the average ores of the mine were commercially worthless. After that date, in the prosecution of inquiry, Wardle was discovered, and his important evidence communicated to complainants' detectives. After that date it was discovered that the small sample of crushed ore sent to Burlingame for assay contained metallic silver, by which it became most probable that the "salting" occurred at Fairplay, and while defendant Van Deusen had access to the bags of samples taken in October. After that date, it was discovered that metallic silver in the form of that placed in the samples was a purchasable commodity, and to be had in Colorado. The past history of the mine was investigated, and facts enough learned to establish the proposition that Van Deusen knew his representations as to average silver contents of the ore in sight were not true. Other circumstances might be enumerated which came to light after the assays of February, 1888, which, with those mentioned above, served to throw a flood of light upon a transaction otherwise wrapped in mystery, though full of suspicion.

The argument has been urged that complainants ought not to have been misled by the presence of metallic silver; that what was said to them when this discovery was made should have put them on guard; that, if they proceeded with the purchase afterwards, it was at their own peril. Whether most persons would have continued, under the circumstances detailed in this record, to go on to the completion of the trade, is debatable. McDermott, looking back to the occurrences antecedent to the last payment of the purchase money through the light of the subsequent discoveries, pronounces himself a fool for going on with the matter. His judgment is too severe. The precautions he had taken to get average samples, and to guard against their corruption, were sufficient to justify his faith. His assays he knew were trustworthy. He had too high a degree of confidence in the common honesty of defendant Van Deusen, but of this defendants cannot complain. All that was done or said by Van Deusen only tended to lull any suspicion and quiet any doubt. That he (McDermott) placed implicit confidence in the existence of native silver in the average ore of the Mudsill mine was known to defendants. That this confidence was the direct result of the "salting" of his samples was equally well known to them. To say that he ought not to have had such confidence does not come well from one whose intentional fraud brought it into action. It is for the defendants to clearly show that the complainants were not misled by their fraudulent conduct. In the case of Reynell v. Sprye, 1 De Gex, M. & G. 548, Cranworth, L. J., in discussing the effect of an untrue representation innocently made, said:

"The case is not at all varied by the circumstance that the untrue representation, or any of the untrue representations, may in the first instance have been the result of innocent error. If, after the error has been discovered, the

party who has innocently made these innocent representations suffers the other party to continue in error, and to act on the belief that no mistake has been made, this, from the time of the discovery, becomes, in the contemplation of this court, a fraudulent misrepresentation, even though it was not originally."

This principle applies with greater force where the representation was originally false. If the party making it repent, he must fully undo the consequences of his wrong. Vague hints and more doubtful warnings will only aggravate the wrong, and will furnish no protection if the fraud continues to mislead, and was an inducement to action. We find no evidence in this case of any effort to undeceive complainant, but much calculated to throw him off his guard and continue the deception. The conclusion upon the whole case is that the decree of the circuit court must be reversed. The prayer for relief as against defendant Watrous must be granted, with interest from date of each payment to him. Defendant Van Deusen must account for the proceeds of all shares sold by him, with interest, and all shares standing yet in his name will be canceled. Defendants will pay the costs of the cause.