### KROHN v. WILLIAMSON et al.

#### (Circuit Court, D. Kentucky. June 12, 1894.)

#### No. 1,841.

1. CORPORATIONS — PROFITS OF CONTRACTS BY OFFICERS — RIGHTS OF STOCK-HOLDERS.

Promoters of a bridge company, the only subscribers to its stock, agreed to assign to complainant a certain interest therein. Thereafter two of them, officers of the company, made on its behalf a contract with a construction company, whereby that company, for $1,000,000 in bonds of the bridge company and the entire $1,500,000 of bridge company's stock subscribed, agreed to construct the bridge, furnish money to acquire land for approaches, and return to the subscribers to the stock $200,000 thereof, the contract reciting that the $1,500,000 stock was used by the bridge company with the consent of the subscribers. At the same time, said two officers agreed with the construction company, for $300,000 in bridge company's bonds and $600,000 in bridge company's stock, to procure and convey title to said lands needed for right of way. They reported the construction contract to their board of directors, but said nothing about the right of way contract. They afterwards procured the necessary lands, using only the bonds for that purpose, and making a substantial profit in the transaction, as they had expected to do. *Held*, that the $600,000 of stock was not a part of the real consideration for the right of way contract, but was a profit on the construction contract, in which complainant was entitled to share, as against said officers, and they held his share thereof as trustees for him.

2. SAME—AGENCY OF OFFICERS—ACTION BY STOCKHOLDERS.

As said officers, in so disposing of the stock, held the direct relation of agents to the stockholders, including complainant, they were directly accountable to the stockholders for the stock improperly diverted to their own benefit, and complainant might maintain an action for his share thereof without showing a refusal of the company to sue.

3. SAME—PAID-UP STOCK.

The subscribers to stock of a bridge company agreed that it might use so much of the stock subscribed as might be necessary to construct the bridge, returning the remainder to be divided among them. The company made a contract with a construction company by which the latter, in consideration of the transfer to it of all the stock subscribed, agreed to construct the bridge, and to return to the subscribers a certain quantity of the stock; and it was agreed that the whole issue of stock should be treated as paid up by the acquisition of the franchises and the erection of the bridge. *Held* that, as between the bridge company and its subscribers, this agreement was valid, and the stock returned to them must be treated as paid up.

4. RELEASE—IGNORANCE OF FACTS—TRUSTS.

The subscribers to stock of a bridge company agreed that it might use so much of the stock subscribed as might be necessary for the construction of the bridge, the remainder to be returned to be divided among them. Two officers of the company, duly authorized, made a contract on its behalf with a construction company, by which the latter was to construct the bridge, receive a transfer of all the stock, and return a part of

it to the subscribers. By another contract, the same officers agreed to procure for the construction company necessary rights of way, in consideration of the transfer to them of certain bonds and a part of the stock. Complainant, one of the parties entitled to share in the distribution under the original agreement, received his portion of the stock returned under the construction contract, and gave the officers a full release of all claims against them, having at that time no knowledge of the right of way contract. *Held*, that the release did not prevent him from subsequently claiming his share of the stock received by the officers under the right of way contract, on the ground that such stock was a profit under the construction contract, and should be divided among the stockholders.

5. LACHES—FAILURE TO MAKE INQUIRY.
The defense of laches, on the ground that complainant, by inquiry, might have learned the facts relied on, and filed his bill earlier, is not available to defendants, who were under obligation to disclose to him such facts without inquiry; especially where the delay has worked no inequity to them.

6. SPECIFIC PERFORMANCE—JURISDICTION—TRANSFER OF STOCK.
Where jurisdiction is acquired on the ground that the suit is to enforce a trust, the court may compel performance of an obligation to transfer stock, the subject of such trust, the value of which is uncertain.

7. CORPORATIONS—CONSOLIDATION—STOCK—REGISTRY OF TRANSFERS.
Two corporations, severally chartered by Kentucky and by Ohio for the purpose of building a bridge across the Ohio river, were consolidated under laws of both states. Plaintiff, in a suit against stockholders to recover stock of the consolidated company, prayed that the transfer to him, if decreed, might be registered, and to that end made the Kentucky corporation a party. *Held*, that the bill must be dismissed as to it, for it had no authority to register transfers of the consolidated stock.

This is a bill in equity brought by Louis Krohn, a citizen of Ohio, to compel R. W. Nelson and John A. Williamson, citizens of Kentucky, to assign to him $48,000 of the capital stock of the Central Railway & Bridge Company. The Central Railway & Bridge Company, averred to be a citizen of Kentucky, is made a party to the bill, for the purpose of securing a register by it of the transfer of the stock.

The action is based on the following facts: Nelson and Williamson, together with one Kirk and one Hawthorn, procured from the Kentucky legislature a charter for a corporation, with power to erect a toll highway bridge from Newport, Ky., to Cincinnati, Ohio. The company was organized, and the four promoters subscribed to $1,500,000 of the capital stock. An Ohio corporation for the same purpose was organized, and the two companies were then consolidated, under the laws of both states. The needed federal, state, and municipal franchises and privileges were obtained in both states; so that nothing remained to be done but the purchase of land for the approaches, and the construction of the bridge. Louis Krohn and C. B. Simrall were interested in the Ohio River Construction Company, organized to float the bridge company's bonds and to build the bridge. A contract was entered into with the bridge company for this purpose. Subsequently, in October, 1889, it was deemed best to abandon the contract, after the partial erection of one pier, begun to prevent the lapse of rights secured to the bridge company by an ordinance of the city of Newport. Krohn contributed to the erection of the pier $336. When the contract between the construction company and the bridge company was abandoned, the promoters of the bridge company, who were also largely interested in the construction company, executed the following agreement:

"We, the undersigned, hereby agree to assign to Louis Krohn the same interest in the Central Railway & Bridge Company that said Krohn now holds in the Ohio River Construction Company, which it is agreed is eight per cent.; the said Krohn to bear his proportion of future expenses incurred by

the Central Railway & Bridge Company whenever the other holders of stock in said bridge company contribute to said expenses their proportion; the consideration hereof being the cancellation of the contract between the Ohio River Construction Company and the Central Railway & Bridge Company, in which said Krohn is interested.

"[Signed]

R. W. Nelson.
"Jno. W. Kirk.
"Jno. A. Williamson.
"L. R. Hawthorn.

"Newport, Ky., Oct. 23, 1889."

By a similar contract, Simrall was given a 5 per cent. interest in the bridge company. By resolution of October 24, 1889, Williamson, as president of the bridge company, was authorized to make a contract for the construction of the bridge. After various negotiations with different bridge construction companies, Williamson and Nelson, who was vice president, director, and attorney of the Central Bridge Company, went to Cleveland, and made two contracts, of date March 31, 1890, with the King Iron Bridge & Manufacturing Company, of that city. One was a contract between the King Company and the bridge company, by which, for $1,000,000 of the bonds of the latter company and $1,500,000 of its stock, the King Company agreed to completely construct and equip the bridge by January 1, 1891; to furnish the money necessary to acquire the title to lands needed for the approaches to the bridge on both sides of the river; to return to the promoters of the enterprise and the subscribers to the stock $200,000 of the capital stock; to treat the entire $1,500,000 of stock as paid up by the acquisition of the franchises and privileges and the erection of the bridge; and to pay to the Central Bridge Company daily interest on $1,000,000 for every day's delay in the completion of the bridge beyond January 1, 1891, except for such delays as might be occasioned by the failure of the Central Bridge Company promptly to procure land for the approaches at reasonable terms. The contract recited that the $1,500,000 of stock conveyed to the King Company by the contract had been subscribed for by the four directors and stockholders of the company, but was used by the bridge company, with their assent, to secure the construction of the bridge. The second contract was made by the King Company with Williamson, Nelson, and D. P. Eels, a banker of Cleveland. By this contract the King Company agreed to give Williamson, Nelson, and Eels $300,000 in money or bridge bonds, and $600,000 in bridge stock, in consideration of their procuring a title to the land necessary for the bridge approaches, and conveying the same to the bridge company; the three individuals agreeing that, if the cost of the land and expenses of purchase and condemnation should exceed $300,000, they would pay the excess. Without such an assurance of the cost of the rights of way, signed by Eels, the King Company would not have entered into the first contract. Eels' interest in the contract grew out of the fact that he had agreed to float the bonds for the compensation usually paid for such services. By a writing of the same date with the contracts just described, Eels stipulated that he was to have no interest or part whatever in the $600,000 of stock, "in consideration of Williamson and Nelson giving their personal attention and service to the purchase and appropriation of the rights of way" necessary to the completion of the bridge. Williamson reported to the board of directors of the bridge company the execution of the construction contract between the two companies, but he said nothing of the right of way contract.

Shortly before the execution of these contracts, Williamson induced Simrall to assign to him his 5 per cent. interest in the bridge enterprise for about $200; and, a few days or weeks thereafter, made several efforts to procure an assignment to him of Krohn's interest in the company, but Krohn declined his offer.

The bridge was constructed, and the necessary rights of way for the approaches were procured. The land cost about $250,000. The expenses and lawyer's fees amounted to $30,000. It was necessary in buying the land to purchase more than enough for the approaches, because the approach on each side ran diagonally across many of the lots. The land was taken in the name of Williamson, and then there was conveyed to the bridge company

only what was required for the approaches. The remnants were kept by Williamson, for the benefit of himself, Nelson, and Eels. Three such lots have been sold for $15,000. On the whole, the profit of the right of way contract, exclusive of the $600,000 of stock, ranged from thirty-five to fifty thousand dollars. Neither Williamson nor Nelson was satisfactorily definite on that subject. In the settlement between Eels, Williamson, and Nelson, Williamson took $5,000, to pay for his services in superintending the purchase and condemnation of the right of way; while Nelson, as counsel in the transaction, had received $6,250. After the completion of the bridge, Krohn applied to Williamson and Nelson for his share of whatever was due to the projectors of the enterprise. He was informed by Nelson, speaking for himself and Williamson, that his interest was limited to 8 per cent. of $200,000 of bridge stock. Krohn was suspicious that this did not include everything he was entitled to, whereupon Nelson exhibited to him the original contract for the construction of the bridge. Krohn insisted that he was also entitled to the $336, which he had advanced to the first construction company, with interest. After correspondence and much delay, upon threat by Krohn of a suit, Nelson and Krohn settled for $16,000 of the stock and $1,050 in money, and Krohn signed the following receipt:

"Received of R. W. Nelson, John W. Kirk, John A. Williamson, L. R. Hawthorn, and the Central Railway & Bridge Co., sixteen thousand dollars of the capital stock of the Central Railway & Bridge Co., in full satisfaction and discharge of all obligations against them, and each of them, and especially as regards an obligation dated October 23d, 1889, of which the paper on the face of which this is written is a true copy; and also the $1,050.00, —in full of all claims whatsoever to date.

"[Signed]　　　　　　　　　　　　　　　　　　　　Louis Krohn.
"March 16, 1892."

Nelson says that he told Krohn that Williamson and he would not make anything except their share of the $200,000 and whatever they might make out of the right of way. Krohn denies that Nelson ever said anything about the right of way. Neither Nelson nor Williamson exhibited the right of way contract to Krohn, and Krohn denies all knowledge of it or its contents until shortly before bringing this action, when he learned of it from a published account of a suit brought by C. B. Simrall against Williamson, in which the fact and contents of the right of way contract were stated. Krohn thereupon tendered back the $1,050 received at the settlement, and demanded $48,000 of the bridge stock, as 8 per cent. of the $600,000 received by Nelson and Williamson in addition to the $200,000 mentioned in the construction contract.

Wm. Goebel, for complainant.

Paxton, Warrington & Boutet, George Washington, and W. W. Cleary, for defendants.

TAFT, Circuit Judge (after stating the facts as above). Were this proceeding an attempt by Krohn to obtain from Williamson and Nelson the profits received by them from the $300,000 in money or bonds, paid by the King Company for the right of way, or from the remnants of land bought, but not used, for the bridge approaches, the objection made by defendants' counsel that Krohn is here seeking to assert the rights of the bridge company, without showing a refusal of that company to act in its own behalf, would be well taken, and the bill would have to be dismissed on that ground; for it is undoubtedly the law that a stockholder cannot be permitted to institute litigation on behalf of the corporation until he has made every effort to induce the corporation to appear and maintain its rights in its own person, and unless its failure or refusal to do so is something like a fraud upon the complain-

ant. Porter v. Sabin, 149 U. S. 473, 13 Sup. Ct. 1008; Dimp-fell v. Railway Co., 110 U. S. 209, 3 Sup. Ct. 573; Hawes v. Oakland, 104 U. S. 450; Macdougall v. Gardiner, 1 Ch. Div. 13. But in the case at bar the stock which Krohn seeks to recover never was the property of the bridge company. It belonged to the original subscribers, who, as the construction contract shows, permitted the corporation to use the same as part consideration for the work of building the bridge. The real agreement between the four promoters and the corporation was that the bridge should be built for the bonds and as much less than the $1,500,000 of subscribed stock as possible, and whatever was left of the stock should be divided among the promoters and subscribers, in proportion to their interests in the enterprise. The original promoters gave Krohn an interest of 8 per cent. When Williamson and Nelson went to Cleveland to make the contract, they not only were acting for the company, but, in the disposition of the stock, they held the direct relation of agents to the stockholders, including Krohn, because it was the stockholders' property they were proposing to deliver; and they owed a duty, not to the company only, but directly to the stock subscribers, to save as much of the stock as possible for division among them. If it turns out that Williamson and Nelson have so arranged the contracts that they have secured for their individual benefit $600,000 of the stock, as an apparent profit of the right of way contract, when, in fairness, it should have been added to the $200,000 returned to the original stock subscribers in the construction contract, I can see no difficulty at all in holding that there was such a direct trust relation between Williamson and Nelson, on the one hand, and the stock subscribers, on the other, in the use of the stock to secure the erection of the bridge, that the former are directly accountable to the latter for the $600,000 stock thus improperly diverted to the individual benefit of the trustees.

It will be observed that the net result to the King Company of the construction and right of way contract was that it should build the bridge for the proceeds of $1,000,000 of bonds and $700,000 of stock, less $300,000 in cash.—the fixed cost of the right of way. It was entirely immaterial to the King Company how the remaining $800,000 of bridge stock was disposed of. It was of no concern to that company whether it was all returned to the stock subscribers in the construction contract. or that some of it was made to constitute part of the consideration for the right of way contract. Nor had Eels any interest in the mode of distributing this $800,000 of stock between the two contracts. In other words, Williamson and Nelson, as trustees, undertook to decide that, of the $800,000 of stock which the King Bridge Company was willing to give back, out of the total issue, the subscribing stockholders should receive but $200,000; and they, in their individual capacity, as additional compensation for entering into the right of way contract, should receive the remaining $600,000. The equity and fairness of this arrangement and division they never submitted to those for whom

they were acting, but they regarded the right of way contract as "a private matter" (to use Nelson's language), with which the other stockholders had no concern. Under these circumstances, there is a heavy burden upon Nelson and Williamson to clearly establish that it was fair and entirely just for them to make the $600,000 of stock part of the consideration for the right of way contract, instead of returning it to the stockholders in the construction contract. The writing by which Eels agrees that he has no interest in the $600,000 of stock imports that he relinquished his interest to Williamson and Nelson in consideration of their giving their personal attention to the purchase of the right of way. But I cannot give this recital any weight. When Eels, Williamson, and Nelson came to divide the profit of the right of way contract, Williamson took $5,000 for his personal attention to the purchase of the right of way, and Nelson's services had been fully paid for by a counsel fee of $6,250. When the three men made the right of way contract, they believed they could secure the necessary land for less than $300,000. Eels expressly so states. Their judgment was vindicated, and they made a handsome profit out of it. Whether Nelson and Williamson can be called to account for that profit by the bridge company need not be here considered. Suffice it to say that, with the burden on them to show that the $600,000 of stock was a reasonable addition to the consideration for the right of way contract, they have not sustained it. If it had been, why should Eels not share it? The explanation that it was used as a consideration for personal services of Nelson and Williamson is shown to be unfounded by the subsequent settlement between the parties. The stock of the bridge company had no determined value. It was wholly speculative. The division of the $800,000 between the two contracts was, in effect, a decision by Nelson and Williamson that, in consideration of the right of way contract, they were entitled to three shares in the profits of the enterprise, while all the stockholders, including themselves, should have but one; and this, without consulting those most interested. Now, was the agreement to furnish the right of way contract for $300,000 burdensome? The circumstances show that it was not. Williamson and Nelson may be presumed to have been quite familiar with the land to be bought and its probable cost, and they do not show any reason whatever for thinking that the contract was a hazardous one. Eels went into it on their assurance, without any indemnity from them, because he and they thought it a profitable speculation. They were right. They cannot complain, now that they are called to account by their principal, who was given no option to approve or disapprove the arrangement before it was executed, if the fairness of it is judged somewhat by its results. On the whole, I am convinced that the $600,000 of stock was no part of the real consideration in the right of way contract, but that it should have been included in the construction contract. It is probable that Nelson and Williamson considered that Krohn's contribution of money and labor to the enterprise was so small, as compared with their own, that

they were justified in thus reducing the value of his interest. But they had given him an 8 per cent. interest in the whole enterprise, and no such plan as this was, to deprive him of the full benefit of it, can stand for a minute when challenged in a tribunal administering equity. This is not the first time that men of good repute and character have deceived themselves into regarding as shrewd business strategy that which, in a court of equity, is wholly indefensible. The conclusion I reach is not based on the comparative credibility of the parties and their witnesses. It rests on the admitted circumstances, from which the inferences I have drawn seem to me to be necessary. Finding, as I do, that the $600,000 was really a profit of the construction contract, and not of the right of way contract, I must hold that Krohn is entitled, as against Nelson and Williamson, to 8 per cent. thereof. Kimber v. Barber, 8 Ch. App. 56; Tyrrell v. Bank, 10 H. L. Cas. 26; Parker v. Nickerson, 112 Mass. 195.

We come next to the objection, urged on behalf of defendants, that, if this $600,000 is to be treated as belonging to the original stock subscribers, then nothing has been paid in on it by them, and its issue as paid-up stock is a fraud upon the company, which a court of equity will not countenance, by compelling its transfer from one subscriber to another. It might be difficult to support such a defense, even if the original issue of the stock were fraudulent as against the company; but it is entirely unnecessary to consider it in this light, for there was no fraud upon the company in the issue of the stock. It was an express agreement between the King Bridge Company and the Central Bridge Company, acting for itself and its other stockholders, that the completion of the bridge, the acquisition of the right of way, and the possession and enjoyment of the franchises and privileges, should be considered a full payment of the $1,500,000 of the capital stock, justifying its issue as full paid-up stock. Such an agreement, as between the company and its stockholders, was entirely valid, however subject to attack by creditors it might be. Scovill v. Thayer, 105 U. S. 143, 153.

The next defense is that Krohn is prevented from recovering herein by the settlement made between him and Nelson, March 16, 1892, when Krohn, in consideration of $16,000 of the stock and $1,050, gave a receipt in full of all claims. It is manifest from what has been already said that the relation between Nelson and Williamson, on the one hand, and Krohn, on the other, was that of trustees and cestui qui trust, or of agents and principal. Before any binding settlement could be made between them, it was necessary for Nelson and Williamson to make a full disclosure of what had been done by them as trustees. Farnam v. Brooks, 9 Pick. 212, 232; 1 Story, Eq. Jur. §§ 315, 316, 316a; Kimber v. Barber, 8 Ch. App. 56; Tyrrell v. Bank, 10 H. L. Cas. 26; Parker v. Nickerson, 112 Mass. 195. It is not claimed that they did this. Nelson says that he told Krohn that he and Williamson would receive nothing except their share of the $200,000 of stock and what they might

make out of the right of way proceedings. Simrall and Krohn deny that Nelson alluded to the right of way matter. But it is not important, for, even if Nelson's account is accurate, this was by no means a full disclosure of the facts. Krohn might fairly have inferred that Nelson was alluding only to reasonable and ordinary compensation for his services as attorney in the condemnation proceedings, and for Williamson's services in securing evidence, etc., for the same purpose. We can be very certain that, if Krohn had known the full truth (which it was Nelson's duty to tell him), Krohn would never have made the settlement. It is quite true that Krohn suspected that he was not being fairly dealt with, and that he therefore insisted that he should be paid an additional amount in cash over and above that which under Nelson's statement of the facts he was entitled to; but I do not see that Krohn's suspicions of Nelson's fair dealing, and a settlement based on them, at all relieved Nelson of the duty to disclose everything. It did not put the parties at arm's length. The trust relation continued in existence so long as the proceeds of the transaction in which it had its inception remained undistributed. For these reasons, Krohn is entitled to have the contract of settlement rescinded, he having tendered back that which he received under it.

It is urged that Krohn cannot have a rescission because he was guilty of laches in not filing his bill earlier. The settlement was made in March, 1892, and this bill was filed a year later. There is no evidence at all to show that Krohn knew of the right of way contract until just before he filed his bill. It is said that he might have learned the facts by inquiry. His inquiries of Nelson, who owed him the duty to tell him, were not productive of much information. Nelson says that he considered the right of way contract a private matter, and so did not think it necessary to tell, even to C. B. Simrall, his fellow attorney in the condemnation proceedings, the particulars of it. It does not lie in the mouth of either Nelson or Williamson, with the obligation on them to tell Krohn everything without inquiry, to complain that he did not go to the King Bridge Company or Eels to learn the facts. Certainly, Krohn has not been supine or slow to assert his rights since he did learn the facts. It is not in evidence that between March, 1892, and a year later, there was such a change in the circumstances, in the market value of the stock or otherwise, that a year's delay in asking rescission, even with full knowledge, would work any inequity to defendants. Mining Co. v. Watrous, 9 C. C. A. 415, 61 Fed. 163, 186.

We have thus far in the case proceeded on the theory that by the paper of October 23, 1889, signed by Nelson, Williamson, Hawthorn, and Kirk, Krohn took a present interest in the enterprise. The language of the paper seems to be, at first sight, that of an executory contract, not giving Krohn any present interest in the enterprise, but only a right to the conveyance of an interest at some time in the future. Taking the whole instrument together, in the light of the surrounding circumstances, however, I think it may be fairly construed to convey a present interest. Under it, Krohn

could be compelled to contribute his proportionate share to any expenses thereafter to be incurred when "the other stockholders" should do so. This certainly implies that, as between the parties to the instrument, Krohn was then a stockholder. Of course, the stock subscriptions were in the names of the four signers of the writing of October 23, 1889, and the legal title to the stock, if it could be properly said to have any existence at all, remained in the four subscribers; but an equitable interest in the enterprise certainly vested in Krohn from the delivery of that writing. The fact is that these projectors were like partners, and, by this writing, they let Krohn in as a partner to share to the extent of 8 per cent. in any stock which after the construction of the bridge might remain for distribution among them. When, therefore, the four stock subscribers received the paid-up stock under the construction contract from the King Bridge Company, they held 8 per cent. of it as trustees for Krohn. This equitable ownership of the stock entitles him to the form of relief he here asks.

It is true that the relief asked is in the nature of a decree for the specific performance of an obligation to transfer personal property, and that, ordinarily, courts of equity will not afford such a remedy. The modern tendency of courts, however, is towards a much more liberal rule in this regard; and, if any good reason appears why damages for conversion will not be adequate remedy for the injury, a decree will be granted. Here the stock has no market value. The damage from conversion would be wholly speculative and uncertain. But the controlling reason why, in this case, the delivery of the stock in specie should be decreed, is that the defendants hold it in trust for the complainant. The confidential relation, in violation of which defendants seek to retain its possession, gives the complainant the option either to have the stock or its value. The court, as a court of equity, acquires jurisdiction of the action, not because damages at law would be inadequate, but because it is an action to enforce a trust, and, having jurisdiction on this ground, may give such full relief as the nature of the case requires. Johnson v. Brooks, 93 N. Y. 337; Stanton v. Percival, 5 H. L. Cas. 257; Cowles v. Whitman, 10 Conn. 121; Kimball v. Morton, 6 N. J. Law, 26; Pom. Eq. Jur. § 14.

The result is that Krohn is entitled to a decree against Nelson and Williamson, finding the ownership of $48,000 of the stock standing in their name to be in Krohn, and ordering them to assign the same to him. The defendant company, the Central Railway & Bridge Company, is a Kentucky corporation, because the bill so avers. If it were the consolidated company, it would be a citizen of both Kentucky and Ohio; and then, the plaintiff being a citizen of Ohio, and one of the defendants being a citizen of the same state, the jurisdiction of this court would be ousted. The stock which Krohn seeks here to recover is stock in the consolidated company, for it was with that company that the King Company contracted. The Kentucky corporation has no authority to transfer or register transfers of such stock. I cannot therefore make a decree against

the defendant the Kentucky company to register the transfer which Nelson and Williamson are required to execute. The bill, as against that company, will be dismissed. As against Nelson and Williamson, however, the decree will be as already stated, and for costs.