AMERICAN SHIPBUILDING CO. v. COMMONWEALTH S. S. CO.

(Circuit Court of Appeals, Sixth Circuit. June 2, 1914.)

No. 2483.

1. CORPORATIONS (§ 448*)—CONTRACTS—SUIT FOR RESCISSION—"TRUSTEE."

Defendant contracted with certain persons, who were named as "trustees," to build a steamship. Such persons, in accordance with a previous agreement with defendant, had taken steps to organize a corporation to own and operate the ship, and at the time of the contract all the stock of the corporation had been subscribed. The corporation was organized, assumed the contract, and on its completion accepted delivery of the vessel and paid for it. *Held*, that the real purchasers by the contract were the stock subscribers for whom the persons signing the same were agents, of which fact defendant had full notice, by the use of the word "trustees" if not otherwise, and that the then contemplated and subsequently organized corporation succeeded to all of their rights, and as such successor and the recognized purchaser to which delivery was made could maintain a suit in equity for a rescission of the sale and purchase for fraud.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1786, 1788, 1807; Dec. Dig. § 448.*

For other definitions, see Words and Phrases, vol. 8, pp. 7128–7133, 7822.]

2. SALES (§ 38*)—RESCISSION BY BUYER—FRAUD.

The contract for the building of the vessel was made pursuant to an option given by defendant to the persons who signed the contract as a basis for forming the corporation, of which they became stockholders, and included in the price named a secret commission which defendant agreed to, and did, pay to such persons for organizing the corporation and securing the contract. *Held*, that such payment and concealment, to which defendant was a party, constituted a fraud on the corporation which, upon prompt election after its discovery and restoration of the status quo, entitled it to rescind.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 65–77, 85; Dec. Dig. § 38.*]

3. CANCELLATION OF INSTRUMENTS (§ 10*)—ADEQUATE REMEDY AT LAW—JURISDICTION.

The vessel having been used for six seasons before the fraud was discovered, and having deteriorated in value by reason of such use, and from other causes, and also being incumbered by a mortgage to secure bonds of the purchasing corporation, which were widely scattered and not due, rendering it difficult or impossible to return it with a clear title, the remedy of the purchaser at law by a return and an action to recover back the purchase price was not adequate, and a court of equity which could afford a more practical and efficient remedy had jurisdiction.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 7, 9, 18–22; Dec. Dig. § 10.*]

4. CANCELLATION OF INSTRUMENTS (§ 60*)—RESCISSION BY BUYER—ACCOUNTING BETWEEN PARTIES.

By a decree rescinding a sale of a steamship on the ground of fraud on the part of the seller, which was not discovered by the purchaser for six years during which it had the use of the vessel, the seller was charged with interest on the purchase money received. *Held*, under the peculiar circumstances of the case, there having been no misrepresentation as to the vessel, which was in all respects what complainant contracted for,

that it should be charged with a sum each year which, as stipulated, would cover the depreciation of the vessel from age and wear during such year, and also with the net earnings made above such sum, if any, in each year, with interest on such sums from the end of the year.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 127–129; Dec. Dig. § 60.*]

Appeal from the District Court of the United States for the Northern District of Ohio, Eastern Division, William R. Day, Judge.

Suit in equity by the Commonwealth Steamship Company against the American Shipbuilding Company. Decree for complainant, and defendant appeals. Modified and affirmed.

For opinion below, see 197 Fed. 797.

Without distinguishing between proof by direct testimony and by inferences which we think clearly proper, and without reference to many details not of ultimate importance, the record shows these facts:

The American Shipbuilding Company (spoken of herein as defendant) was engaged, at Cleveland, in the business indicated by its name. W. A. and H. A. Hawgood, also of Cleveland, were engaged in the vessel business, both on their own account and as managers of lines owned by others, and had a high local reputation for ability and success in this business. After some negotiation, it was, on July 1, 1905, agreed between the Shipbuilding Company and the Hawgoods that the latter should undertake to organize a corporation or otherwise assemble capital to buy a ship to be built by the company, and that, for thus making the sale, the Hawgoods should receive a commission of $15,000. Pursuant thereto, the Shipbuilding Company wrote to one of the Hawgoods a letter describing the proposed ship and giving him an option for the price of $385,000, to be paid $195,000 in cash and $190,000 in purchase-money mortgage bonds. The commission bargain was not mentioned in the letter, but it was understood that the price named included the commission, and that the net amount of cash required would be $180,000. The Hawgoods and their associates then prepared a prospectus of a proposed Ohio corporation, to be called the Commonwealth Steamship Company (called herein plaintiff). The capital stock was to be $200,000, and $200,000 of mortgage bonds were to be issued. The Hawgoods were to be two of the directors, and were to be agents for the company. The vessel to be built and acquired was described in general terms, and it was said that "under option already given by the American Shipbuilding Company to W. A. Hawgood & Company, Cleveland, Ohio, this steamer will be built at a cost of $385,000, and ready for delivery at the opening of navigation in 1906." The prospectus set out much general information regarding the vessel business on the Great Lakes, estimated the gross earnings and the operating expenses of the proposed ship, and indicated annual net earnings of $61,000, which would pay the first year's interest on the bonds, 10 per cent. dividends on the stock, retire $20,000 of the bonds and leave $11,000 for surplus. To the prospectus, a subscription agreement was attached promising payments to Hawgood & Co. in installments as called by them. The Hawgoods subscribed $20,000, and the remainder of the proposed capital was taken by a large number of subscribers. Thereafter, and on August 16, 1905, a formal contract for the construction and sale and purchase of the ship, to be called the "Abraham Stearns," was entered into between the Shipbuilding Company and the Hawgoods. The purchasers were named in the contracts as, and signed the same as, "trustees," and all parties understood that the Hawgoods were making this contract as trustees for the subscribers. Installment payments were called for and were made by the subscribers in August, and again in October, and the sums so received by the Hawgoods were paid over to the Shipbuilding Company. The formal organization of the Commonwealth Company did not take place until November, 1905. Articles of association were then subscribed by the two Hawgoods and three other prospectus signers, and these

five persons proceeded to organize the corporation and hold the first stockholders' and directors' meetings, whereby, on November 22, 1905, the corporation first acquired complete legal existence. At this organization meeting, a stockholders' resolution was passed, reciting that the contract with the Shipbuilding Company had been made by the Hawgoods on behalf of the subscribers of the capital stock to the Commonwealth Company, and taking over the contract for the corporation. On the same day, the directors passed a resolution reciting that several named persons had rendered valuable services for the corporation "in the way of selling its capital stock and otherwise looking after its interests," and that the Hawgoods "have contracted for the steamer 'Abraham Stearns,' and have promised and agreed to convey the same to the Commonwealth Steamship Company for $10,000 less than such steamer can now be purchased, and have otherwise carefully guarded the company's interest," and thereupon directing that the Hawgoods be paid $5,000 and that each of the other named persons be paid specific sums for their respective services. This compensation was additional to, and given wholly in ignorance of, what the Hawgoods were to receive from the Shipbuilding Company, which paid the Hawgoods the $15,000 commission at about the time the first payment was made on the ship.

The carrying business on the Great Lakes was notoriously subject to great fluctuations, having periods of great prosperity and periods of depression. This was known to the prospective subscribers. The ship was built and delivered in the spring of 1906, and was operated for the Commonwealth Company under the management of the Hawgoods for five seasons, and, in 1911, until September. The net earnings in 1906 were $62,000; in 1907, $46,000; for the three seasons of 1908, 1909, and 1910 the earnings and operating expenses about balanced; the boat was not operated all the time; and, in the season of 1911, the boat was tied up. During the last-named year, other directors than the Hawgoods first learned, and so it may be said that the corporation first knew, of the payment of the $15,000 commission. Thereupon, and in September, 1911, the Commonwealth Company filed this bill, setting out that the payment of the secret commission was a fraud by the Shipbuilding Company against the Commonwealth Company entitling the latter to rescind, tendering back the ship, offering to do equity, and asking a decree which would determine the proper conditions, effectuate the rescission, and compel the repayment of the purchase price. A decree was rendered for the Commonwealth Company ([D. C.] 197 Fed. 797) awarding rescission, directing the repayment of the full purchase price, with interest at 6 per cent., less the net earnings of the ship during the whole period, and less the amount of the outstanding unpaid mortgage bonds which were to be assumed by defendant. From this decree, defendant appeals.

A. C. Dustin and Richard Inglis, both of Cleveland, Ohio, for appellant.

A. B. Thompson, C. P. Hine, and C. R. Bissell, all of Cleveland, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] The Shipbuilding Company's primary defense, while stated in varying forms, is essentially that there never was any sale contract from the Shipbuilding Company to the Commonwealth Company, and hence that there can be no rescission of such contract. The argument is that the defendant's agreement to build and sell the ship was made on August 16th, and was made with the Hawgoods, three months before the Commonwealth Company was organized, and that the bill should have been filed against the Hawgoods to obtain a rescission of the taking over

contract of November 22d.   It is clear that the contract of August 16th was not merely a sale to the Hawgoods personally.   It was made expressly to them "as trustees."   It does not say for whom they were trustees, but the subscription to the corporate prospectus was then completed, and we think it was fully understood by both parties that the Hawgoods were acting as trustees for these subscribers, and that the contract was really in the interest of, and was made for the purpose of being transferred to and assumed by, the corporation which was about to be organized.   The circumstances and the conduct of the parties before and after August 16th fully support this conclusion.   In this situation, the word "trustees" is, in equity, to be treated as something more than a mere description of the person; and this view is not necessarily inconsistent with the existence of full personal liability by the Hawgoods and with the right of the Shipbuilding Company to enforce the contract against them personally, if it desired to do so.   A trustee is an agent, and whether we call these subscribers beneficiaries of the trust or principals of the agent is immaterial.   In either event, they were, in equity, the real purchasers of the ship from the Shipbuilding Company by this contract of August 16th; and of this fact the Shipbuilding Company had full notice, by the use of the word "trustee," if in no other way.   R. R. v. Durant, 95 U. S. 576, 579, 24 L. Ed. 391; Geyser Co. v. Stark (C. C. A. 8) 106 Fed. 558, 561, 562, 45 C. C. A. 467, 53 L. R. A. 684.

The situation which we have recited makes immaterial much of the argument presented regarding the right of a corporation to sue for wrongs done before its existence.   If a particular fraud is calculated to injure, not any existing persons, but only a corporation which may thereafter be organized and the stockholders of which are uncertain, or not all of whose stockholders may be charged with full notice, a right of action may be found in the subsequent corporation with difficulty, or not at all.   Old Dominion Co. v. Lewisohn, 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025; Davis v. Las Ovas Co., 227 U. S. 80, 33 Sup. Ct. 197, 57 L. Ed. 426.   No such difficulty here exists.   August 16th the full plans had been made and individuals had agreed to subscribe all the stock.   If a wrong was done to these expectant stock subscribers, any appropriate equitable remedy accrued at once to them, though at the instant they were only prospectus subscribers.   If defrauded, they could have maintained suit for rescission of the contract which their agent had made for them.   What they did do was to proceed exactly as planned, organize the corporation, exchange their subscription rights for capital stock, and then, as a corporation, take over and complete the contract which their agent had made.   The transaction is, in effect, the same as if the body of individual associates had ratified and taken over the purchase contract from their agent and then had transferred the contract to the corporation.   That would be, and the present contract of assumption is, an assignment in form, but in real substance it is a matter of succession, not of transfer.

It is also to be remembered that we are not dealing with what is even in form a transfer of existing property, but with a substitution of parties in a contract relating to property under construction; that the

sale was never complete and the entire title to the ship never passed till the delivery of the ship, in April, 1906, from the Shipbuilding Company, the contract vendors, to or for the Commonwealth Company, the then existing contract vendee. Of the purchase price, all except the first $56,000 was paid after the corporation was formed and (practically) from its funds. The cash did not, in form, go through its treasury, though what was done amounted to that; but the bonds were issued directly by the corporation, and they or their proceeds were paid by or for the corporation to the Shipbuilding Company. Whatever might be the rule under other situations, we have no doubt that these circumstances permit the Commonwealth Company to be heard on the merits of its demand for rescission against the Shipbuilding Company, and constitute a sufficient answer to the claim that to proceed against the Hawgoods for causing the November taking over contract is the exclusive remedy. Mudsill Co. v. Watrous (C. C. A. 6) 61 Fed. 163, 9 C. C. A. 415; Alger v. Keith (C. C. A. 6) 105 Fed. 105; Donovan v. Campion (C. C. A. 8) 85 Fed. 71, 29 C. C. A. 30; Morawetz, § 548; Veazie v. Williams, 8 How. 134, 12 L. Ed. 1018. It is not important that the specific prayer of the bill is for a rescission of the original contract of August, 1905, while it turns out that the vital thing to be rescinded is the conveyance of April, 1906. The two were parts of the same transaction, each involved the other, and the prayer for general relief is ample to support a decree directed primarily against the final step (Lockhart v. Leeds, 195 U. S. 427, 436, 437, 25 Sup. Ct. 76, 49 L. Ed. 263), and this is the effect of the decree, whatever its form. It is overnice to attempt to distinguish between the parts of this continuous and unbroken transaction. The building contract was made in August, the parties, on one side, were renamed in November, and the completed boat was delivered and the balance of the purchase price paid in the next April. This bill was filed to get the money back and to return the boat, and it was rightly filed against the party which had received the money and had furnished the boat.

[2] The record sufficiently discloses the Shipbuilding Company's knowledge that the payment by it of the $15,000 commission to the Hawgoods was to be concealed from the principals or beneficiaries for whom the Hawgoods were acting—indeed, it shows participation as well as knowledge. The naming of the gross price which included the commission, and the insertion of this price in the option which must have been intended to be used as the basis of raising money to carry it out (and which was in fact recited in the prospectus) is convincing evidence that the Shipbuilding Company deliberately aided the Hawgoods in concealing the commission. Such payment and concealment, under the circumstances here shown, constituted a fraud against the purchaser which, upon prompt election, and upon restitution of the status quo, would have entitled it to rescind. Yeiser v. U. S. Co. (C. C. A. 6) 107 Fed. 340, 46 C. C. A. 567, 52 L. R. A. 724; Erlanger v. New Sombrero Co.; 5 L. R. (Ch. Div.) 73; Davis v. Las Ovas Co., supra.

[3] At all stages of the case, the Shipbuilding Company has insisted that the purchaser had an adequate remedy at law and could

not proceed in equity. This contention does not depend alone on the theory that an action for damages is the vendee's only remedy; it insists that, even though a rescission may be called for, that rescission may be had at law, the property involved being personalty, by tendering back the property and suing for the purchase price. To the suggestion that fraud is a sufficient basis for the relief, it is answered that fraud alone will not give equity jurisdiction (Equitable Society v. Brown, 213 U. S. 26, 50, 51, 29 Sup. Ct. 404, 53 L. Ed. 682), and to the claim that an accounting is involved, it is replied that a court of law can take an account of damages (Root v. Railway Co., 105 U. S. 189, 26 L. Ed. 975). It has often been held that the remedy at law, to be "adequate," must be "as practical and efficient" as that in equity. Tyler v. Savage, 143 U. S. 79, 95, 12 Sup. Ct. 340, 36 L. Ed. 82. In the instant case, the legal remedy by tender of the property and suit for the purchase price is, for two reasons, inadequate under these definitions: The first is that the parties cannot be placed in statu quo —a mere return of the property would not accomplish this result. The ship had been used for six seasons. It was, in value, a very different piece of property from that originally received, not only because of its deterioration from use, but on account of different business conditions and prospects. It is not necessary to say that the impossibility of putting the parties back where they were would wholly defeat a rescission at law, but it would present a troublesome obstacle. This case is peculiarly appropriate for balancing of equities involved in treating the changed conditions. The extent to which interest on the one side and the value of the use of the boat on the other should be considered, the many complications attending determining the fair value of that use for which a counter liability ought to exist, the extent of the duty of plaintiff to account for the profits which it had received while it used the boat, which profits, in the event of rescission, take on something of the character of a trust fund—all these considerations, in connection with the extent to which fraud is at the basis of the complaint, make apparent that the controversy is suitable for the court of equity, and that a suit or proceeding at law would not be so completely "efficient for the ends of justice" as to make that remedy wholly adequate and therefore exclusive.

The other reason is this: The purchase money bonds had been scattered into the hands of many innocent holders, they were not due, and the Commonwealth Company could not restore the boat free from incumbrance. It was perhaps not impossible to meet this situation at law; but it was practically necessary to provide, as was done by the decree below, that the Shipbuilding Company should take the boat subject to this incumbrance, which it should assume and pay, and that it should have credit for the amount so assumed.

[4] The subject of restoring the status quo presents unusual complications. A perfect restoration cannot be made. From age and ordinary wear and tear, there was an annual (stipulated) depreciation of 2½ per cent., or a total of 15 per cent. for the six seasons that were involved (the remainder of the sixth season after September being for this purpose negligible). This depreciation, computed upon $370,000

(the sum fixed by the master as the net value for this purpose), would be $55,500. By the use of the boat during this period plaintiff received net earnings of $123,741. These earnings were computed without allowing any depreciation as an operating expense. It is strenuously contended that a fair rental value of the boat, or the net earnings which plaintiff would have received, if the boat had been managed with the sole purpose of earning as much as possible, would have averaged at least $40,000 per season, or $240,000 for the period. On the other hand, interest at the legal rate in Ohio, upon the purchase price, until the date of the decree below, amounted to about $154,000. The circumstances affecting the relative equities of the parties are unique. There was no misrepresentation or fraud as to the thing sold. The purchasers got exactly what they desired and expected to get. Neither were they deceived in the business in which they expected to engage; it was reported to be profitable, and it was. Allowing for interest upon the full amount of mortgage bonds and without regard to the depreciation, the business showed earnings upon the subscribers' investment, for the first season, of about 27 per cent., and, for the second season, about 18 per cent. With the stipulated allowance for depreciation, these earnings would have been, respectively, 22 per cent. and 13 per cent. It is improbable that if the deception as to the purchase price had been fully disclosed at any time during the first two years, the plaintiff would have desired to rescind; the inferences to be drawn from usual human conduct indicate that plaintiff would have elected to affirm the sale, and would have proceeded at law for its damages. Only after the several indifferent and bad seasons which were due to general business conditions did the Commonwealth Company seek this relief, and we cannot resist the conclusion that a rescission, instead of some other remedy, is really desired, not because of the usual reasons inducing that election, but because the bargain turned out to be an improvident one. The delay in the discovery of the fraud satisfies the requirement that a rescission must be promptly demanded, but it does not change the aspect of the case of which we now speak. These views strongly impel us to direct that defendant may avoid a rescission by refunding to plaintiff a portion of the price paid. Such a decree would be a recognition and application of the principle on which relief was determined in Veazie v. Williams, 8 How. 134, 12 L. Ed. 1018, and, broadly speaking, would do real justice between the parties. However, we are unable to see any sufficiently accurate basis for such a decree. There is not here, as there was in Veazie v. Williams, any distinct boundary line to the results of the fraud, and if we undertake to fix a sum which should compensate plaintiff for all the injuries coming from the bribery of its agents, and which should, in addition, penalize defendant so as to discourage similar transactions, we would be without any guide. The power of the equity court to make any such conditions which, however vaguely, appeal to it as equitable is not to be doubted, but we cannot approve an apportionment resting so wholly on surmise. Notwithstanding this conclusion, these matters just stated may be given due effect in fixing the equitable conditions to be attached to the decree. In the ordinary case of rescission, where the

purchase price is to be repaid, the rule would be that the defendant should pay interest on the money and the plaintiff should account only for the sums which, while managing the property in good faith, it had actually received, and should not be liable for depreciation (Pomeroy's Eq., [3d Ed.] vol. 6, § 688; Neblett v. MacFarland, 92 U. S. 104, 23 L. Ed. 471); but to apply this rule where, after six years, and because of a fraud just discovered, plaintiff claims a rescission which it would neither have demanded nor accepted if the discovery had been prompt, is to show lack of due regard for cause and effect, and to transform what should be an elastic rule into one hard and fast. Under the conditions shown by this record, to attempt to impose on plaintiff a liability for rental value, or for earnings it should have made, is to resort to a standard too vague and speculative for safe use; but we think it will impose upon plaintiff a suitable burden on account of the business hazards which it deliberately accepted, and will, at the same time, not unduly relieve defendant, to require that defendant repay the purchase price with interest at the legal rate, and to require the plaintiff to account for the depreciation each year and for any net earnings which it may have received in any season over and above the stated depreciation. The theory of this is that plaintiff, for the business chances and opportunity which it desired and which it has had, must pay at least the amount of the regular and normal wear and tear and depreciation of the property which it has been using, and this fixed liability—or liability at all events—it must balance against its chance to have made a much larger sum as profits, and that in addition plaintiff must account for any sum which it actually did receive in each season above this arbitrary liability. It should not be required to pay, for any one season, both depreciation and its entire net receipts, but only the excess of its net receipts above depreciation. This is only accounting for earnings, but is requiring plaintiff to earn at least this minimum. It should also account for interest upon all net earnings which it actually did receive in any season, whether above or below this arbitrary standard. This liability to pay interest upon the fund which was accumulating in its hands, and computed from the time of receipt, is the equitable counterbalance to the defendant's liability to pay interest on the fund which it received. The fund received and retained in the hands of defendant, and ultimately to be returned to the plaintiff, is allowed to draw interest; it is only treating both parties alike to say that the fund accumulating in the hands of plaintiff and eventually to be (in effect) paid to defendant should likewise draw interest.

This principle is not affected by the fact that in a single season plaintiffs may have made no profits, or may even have suffered a loss. The seasons are very distinct. Each may well be considered an independent unit. In some other business, it might be that the whole period would be the appropriate unit; but we are dealing with the facts of this case. To permit the loss suffered during a properly separable and independent period to be deducted from the gains made during other independent periods is in effect to permit the recovery of damages which are too speculative and remote. Plaintiff is treated with sufficient liberality in holding that it need not account for profits which

perhaps it should have made but did not. Interest computations should be made from the close of each season—from January 1st would be a suitable date—and should be continued until the date of filing the bill. At that date, plaintiff had done everything possible to rescind, and the decreed rescission should take effect by relation as of that date, and the net amount so fixed bear interest from that date.

Except as here indicated, the decree below will be affirmed. Appellant will recover the costs of this court. The entry of an order remanding will be delayed 20 days from the filing of this opinion. If within this time, counsel can stipulate as to the decree which should be entered below pursuant to this opinion, the order will direct the entry of that decree, and our order will then be final (Merrill v. National Bank, 173 U. S. 131, 134, 19 Sup. Ct. 360, 43 L. Ed. 640), so that there will be no lack of finality to embarrass any available review. In the absence of such stipulation, the case will be remanded in order that the necessary computations may be made below and a decree then entered pursuant to this opinion.