**SALE et al. v. WORLD OIL CO. et al.**
No. 601.

District Court, N. D. Texas.
April 18, 1933.

322

Arthur A. Diehl, Dean & Perkins, and Boykin & Ray, all of Fort Worth, Tex., for complainants.

McLean, Scott & Sayers, of Fort Worth, Tex., for defendants Frank M. and Madeline Greene.

R. M. Rowland, of Fort Worth, Tex., and G. P. Dougherty, of Houston, Tex., for defendant Humble Oil & Refining Co.

FRANKLIN E. KENNAMER, District Judge.

This is a proceeding ancillary to the equitable action in this court of J. W. Sale et al. v. World Oil Company, Inc., et al., in which receivers were appointed for the World Oil Company; and is prosecuted upon a bill filed under the case number of the main action by the receivers so appointed, supplemented by a stockholders' intervening bill in aid, against Chester R. Bunker, E. Harriette Bunker, his wife, Mrs. N. E. Thiell, Frank M. Greene, and Madeline Greene, his wife, and the Humble Oil & Refining Company, as defendants, for an accounting and to recover alleged diverted trust proceeds. The cause was referred to a special master for hearing upon both the pleadings and the merits, and is now before the court on exceptions of complainants and defendants to the master's report.

A history of the incidents which brought about this litigation reveals many unique and involved features. Defendant Chester R. Bunker was the organizer, principal stockholder, and in control of the World Company, a Texas corporation, chartered to do a printing and publishing business, chiefly engaged in the publication of the Texas Oil World, which was ostensibly a trade journal for the oil industry, but in fact mainly devoted to the oil promotions of Bunker. During the years 1922 and 1923, Bunker, for the purposes of inducing subscriptions to the Texas Oil World, and in furtherance of his promotional activities, through the columns of the paper and otherwise by alluring literature, offered, as premiums to prospective subscribers, memberships in clubs designated as "Texas Oil World Marathon Fold Club" and "Texas Oil World Marathon Fold Drilling Club." For the basis of his club promotions he acquired, at a small cost, some "wild cat" oil and gas leases in Crockett county, Tex., covering, at the beginning of the club promotions, at least 10,000 acres, and part of the time during the period of the promotions as much as 12,000 acres, taking title thereto in the name of the World Company.

The Marathon Fold Club was first organized and provided for 10,000 membership units; one unit to be given as a premium for a one-year subscription to the Texas Oil World, and each unit, as recited in the membership card, entitling the holder thereof to "a 1/10,000th interest in all emoluments and profits accruing from certain oil and gas leases of 10,000 acres, more or less in Crockett County, State of Texas, and held in trust for all members by the undersigned trustee."

About the middle of the year 1923, Bunker began the promotion of the Marathon Fold Drilling Club, advertising to the public that not all of the 10,000 units in the Marathon Fold Club had been sold, and consequently the World Company still owned a substantial portion of the 10,000 acres of leases, from which unsold portion the World Company would donate 1,000 acres to the new club. The Marathon Fold Drilling Club was to be composed of 10,000 membership units; one unit to be given as a premium for each three years' subscription to the paper, and each unit to entitle the holder thereof to a 1/10,000 interest in the 1,000 acres, and a well to be drilled thereon, free of cost to the unit holders, and with recitals otherwise about the same in the membership cards issued as those contained in the first club organized. This proposition went over much better than the first one and was practically all sold out.

After the Marathon Fold Drilling Club campaign had been presented, and in the summer of 1923, Bunker employed defendant Frank M. Greene, an experienced oil well driller, to begin the drilling of a well in Crockett county. The drilling of this well continued for many months, and finally on June 8, 1925, was found to be a producer. Prior to this date, on November 24, 1924, the World Company, by charter amendment, became the Bunker Printing & Book Company, and Bunker offered to the public, in his usual manner, an issue of preferred stock in the company, with a stock bonus to each purchaser of $100 worth of stock, a 1/250 interest in a 50-acre oil and gas lease in Crockett county, Tex., particularly described, and which was acquired by Bunker in his own name

about December 12, 1924. In the bonus agreement given stock purchasers it was represented that a well was being drilled in the vicinity of this tract, and, in the event the well should prove that oil and gas might be profitably produced from the premises, then Bunker would use his best efforts to either let a drilling contract on said tract on some basis free of cost to the interest owners, or sell the same outright and distribute the net proceeds to them. This promotion was called the "Crockett County Lease Bonus" and was not very successful.

Features common to all three of the promotions were that Bunker was to be the trustee, and that the interests given to the subscribers were simply for the purpose of promoting the circulation of the oil journal and its business, and that neither Bunker nor his corporation were to benefit or profit from the promotions.

For the drilling of the well, Greene and Bunker had a verbal contract whereby Greene's compensation was to be $200 per month. Greene dealt with Bunker and looked to him for his salary, but in fact was paid by the World Company. During the year 1924 he was not able to collect his salary regularly, and on October 12, 1924, the back salary amounted to $1,700. At that time Greene became concerned about trying to collect. He went to Fort Worth and finally agreed with Bunker that he should receive assignments from the World Company of oil and gas leases covering 160 acres in Crockett county, a part of which was a 40 acre offset to the drilling well. Greene also received $50 in cash. He agreed that these considerations should pay his back salary in full, and that he would continue with the drilling of the well. An assignment of the 40 acre offset was executed and delivered to Greene on October 12, 1924, and duly placed of record on January 17, 1925.

During all the time of these promotions, Miss E. H. Thiell was an employee of the World Company and also, according to the literature sent the subscribers, secretary of the drilling club. She subsequently became Bunker's wife and as such is a defendant here. On December 12, 1924, Bunker caused his corporation to execute an assignment to himself and Miss Thiell of another 40-acre offset to the drilling well. This assignment was properly recorded January 25, 1925. The consideration recited was $1,200 cash, and Miss Thiell paid her portion of the consideration, partly in cash and partly by deductions

from salary, but Bunker gave no consideration for his half interest in the lease.

About June 10, 1925, Bunker and defendant Humble Oil & Refining Company reached an oral agreement for the sale of the well and surrounding acreage, aggregating 2,710 acres, and this agreement was a few days later reduced to writing, in which the Bunker Printing & Book Company, successor to the World Company, E. Harriette Thiell, Chester R. Bunker, and Frank M. Greene were designated as the sellers. The deal with the Humble was consummated June 20, 1925, by the delivery of an assignment to it executed by the sellers named in the contract, and a check for $350,000 was issued by the Humble, payable to the Bunker Printing & Book Company, Chester R. Bunker, E. H. Thiell, and Frank M. Greene, and delivered to Bunker. The assignment provided, as a further consideration, for the payment to Bunker Printing & Book Company, of $1,-050,000 out of oil runs. While the deal with the Humble was pending, Bunker, Greene, and Thiell, together with two other employees of the Bunker Printing & Book Company, incorporated the World Oil Company, with a capital stock of $300,000, fully paid; the stock being paid for by the transfer of all the assets theretofore belonging to the three clubs to the corporation. The Bunker Printing & Book Company, under Bunker's direction, assigned to the new corporation $900,-000 in deferred oil payments due from the Humble under the sale contract, valued at $100,000, and also transferred to the new corporation the remaining oil and gas leases belonging to the three clubs, valued at $200,-000, the transfer describing the leases which aggregated about 5,000 acres. All of the capital stock, with the exception of 400 shares divided among the other organizers, was subscribed to by Bunker. The minutes of the first meetings of the stockholders and directors, who were in both cases the same as the incorporators above named, showed that Bunker had transferred or caused to be transferred to the new corporation all the assets belonging to the three clubs, of which he had been "acting as trustee," and which properties constituted the assets of the corporation. These minutes also showed that the stockholders and directors accepted the assets in payment of the entire capital stock, and directed Bunker to surrender 97,000 shares to the treasury, to become the property of the corporation, and that the officers should issue the remaining approximately 200,000 shares, except the qualifying shares of the other individual

organizers, to members of the three clubs, who were thereupon to surrender their membership certificates in the clubs in lieu thereof. Practically all the club members made this exchange.

The check for the $350,000 cash payment made by the Humble was indorsed by all of the payees, and Greene received $75,000, Bunker $37,500, and Miss Thiell $37,500 of the sum, the remaining $200,000 being deposited to the credit of the new World Oil Company, whose charter was granted June 29, 1925. $100,000 of this sum so paid into the treasury of the World Oil Company was, within a short time, disbursed to the stockholders, who had exchanged their club memberships for stock, by way of a cash dividend on the basis of $10 for every unit or membership. Subsequently, under division orders out of production, the World Oil Company received a considerable sum of money, and Bunker and his wife, the former Miss Thiell, and Greene and their assigns received the following amounts:

Greene ........................$33,544.18
Chester R. Bunker .............. 16,772.09
E. H. Bunker (née Thiell) ...... 16,772.09

Since the institution of the main action, there has been paid into the registry of the court, the sum of $9,624.69 out of oil runs.

The receivers were appointed for the World Oil Company in the main action, on July 24, 1930, and, after an examination of the affairs of the company and the circumstances of the creation of the trust and the sale to the Humble, this ancillary action was brought.

The master has filed a single report, divided into two parts, the first dealing with the motions and the second with the merits of the case; the report being made in such manner for reasons therein stated. The master has recommended that all motions to dismiss the receiver's bill and to strike the intervention of stockholders in aid thereof be overruled, except as to a certain part of one paragraph of the bill of complaint, which complainants conceded should be dismissed, and which is not here material. The grounds urged to warrant a dismissal of the bills, were: (1) want of equity; (2) that complainants were without right of action; (3) that the causes of action were barred by the two and four years' Texas statutes of limitation and by laches.

The intervention was filed with leave of court by certain stockholders of the corporation who were beneficiaries of the alleged trust, on their own account and on behalf of all other beneficiaries similarly situated,

praying that, if it should be held that the right of action did not pass to the receivers in their capacity as such, as alleged by the receivers in the bill of complaint, nevertheless, the receivers be permitted and authorized to prosecute the action for and on behalf of the interveners as stockholders of the corporation and beneficiaries of the alleged trust estate. The motion to strike this bill of intervention set up that it did not show the court had jurisdiction; that no relief was sought in favor of the interveners; that, unless the receivers have the right to maintain the suit independently of the intervention, such intervention could not give them the right; and, further, that the bill of intervention was wanting in equity and defective, in that it did not show to which clubs the interveners belonged, or the number of units or interests owned by each. I am of the opinion that the master's report recommending the overruling of these motions should be confirmed.

In his report on the merits, the master has recommended the entry of a judgment against defendants Chester R. Bunker and the Humble Oil & Refining Company jointly and severally in the amount of $215,388.36, with interest, and against defendant Frank M. Greene in the sum of $106,844.18, with interest, and a further judgment that the complainants own and are entitled, as against all the defendants, to all the deferred oil payments from the leases conveyed to the Humble Oil & Refining Company, including all sums paid into the registry of the court. I am of the opinion that the master's recommendation that judgment should be rendered against all the defendants should be confirmed, but modified as to defendants Humble Oil & Refining Company and defendant Frank M. Greene in amount, as hereinafter set out.

The issue of limitations and laches was again raised in the answers of the defendants, and will be discussed along with the other issues involving the merits, but it is well at this point to recur to the question of whether the receivers of the World Oil Company can bring this action, which was also raised by the motion to dismiss the bill. As recited by the master, it is not disputed that, if the World Oil Company, Inc., were not in receivership and could bring the action, the complainants, as receivers, might also do so. The defendants contended that neither the corporation nor its receivers had any right of action; that, if any existed, it was in the beneficiaries of the alleged trusts, and they alone were entitled to sue. Here we have a trustee and beneficiaries in existence, and operating be-

fore there is a corporation in contemplation, and the corporation was an instrument chosen by Bunker to merge the interests of the cestuis que trustent in a corporation, for the purpose of better effectuating his fraud upon them. It is true, under the terms of the trust, the beneficiaries were entitled to its proceeds, and would have had a right to sue because of the frauds perpetrated by Bunker, but now they have all come into a new corporation, and it would seem clear, as a matter of equity, that the cause of action thereby accrued to the corporation. The following cases abundantly support the conclusions of the master in this respect: Davis v. Las Ovas Co., 227 U. S. 80, 33 S. Ct. 197, 57 L. Ed. 426; Yeiser v. U. S. Board & Paper Co. (C. C. A.) 107 F. 340, 52 L. R. A. 724; Commonwealth S. S. Co. v. American Shipbuilding Co. (D. C.) 197 F. 797; Id. (C. C. A.) 215 F. 296, 304; Chandler v. Bacon (C. C.) 30 F. 538; Walker v. Pike County Land Co. (C. C. A.) 139 F. 609; Tilden v. Barber (D. C.) 268 F. 587; York Mfg. Co. v. Brewster (C. C. A.) 174 F. 566.

Agreeing with the master that the receivers had the right to maintain the action, I am likewise in accord with his conclusions that, while the intervention filed by the stockholders was not required to confer right of action on the receivers, still the interveners had the right to come into the litigation as they did, and their presence is agreeable to the principles of equity procedure.

■ Coming to the merits of the case, and considering limitations and laches, the master has held adversely to the defendants, and I think his conclusions should not be disturbed. These matters will be discussed with reference to the Humble Oil & Refining Company, for the reason that this defendant has made the strongest insistence on these defenses. The theory of the complainants' case against the Humble is that the latter had notice of the trusts and of a misapplication of trust assets by the fiduciaries, and having made this purchase of trust property, with such notice, it is held to the same liability as the original trustee as to the application of the trust assets; and, further, that having taken with notice of the trust it became bound to carry out the same, and, if the trust was violated, limitations did not begin to run until discovery of the fraud, or, under all the circumstances of the case, until it should have been discovered. Among the basic principles involved in the application of the doctrine of limitations applied to this case may be said to be that contained in the statement made

in Bailey v. Glover, 21 Wall. (88 U. S.) 342, 348, 22 L. Ed. 636, wherein the court said: "We also think that in suits in equity the decided weight of authority is in favor of the proposition that where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."

■ The language of Judge Van Valkenburgh in Schindler v. Spackman, 16 F.(2d) 45, 48 (C. C. A. 8), to the effect that "furthermore, a federal court of equity will never follow a state statute of limitation, where thereby manifest wrong and injustice would be wrought," is applicable to the facts here.

I think the findings of fact by the master as to notice to the Humble was correct and should be confirmed.

■ The assignment of the 40-acre offset to Bunker and Thiell had been placed of record long prior to any negotiations between Bunker and the Humble. Then, after the verbal agreement with reference to the sale of the acreage purchased by the Humble had been made, and prior to the final closing of the deal, Cleaves, an attorney for the Humble, who was passing on the sufficiency of the title to be conveyed it, received information as to club memberships outstanding and the nature of the trusts thereby created. Copies of the certificates of membership in at least two of the clubs was shown to Cleaves before the deal was consummated, and the matter was discussed between him and Morgan,, an attorney representing Bunker, and the others named as sellers in the Humble contract. Bunker and Greene, together with their attorney, Morgan, and one Thomas, a banker of Fort Worth, went to Houston and there had a discussion as to these outstanding interests in the presence of Cleaves, and also in the presence of officers with authority to make the contract on behalf of the Humble. There is further evidence in the record of circumstances importing notice of the trusts to the Humble, and the master's finding that the Humble had constructive notice of the trusts is amply warranted by the evidence. As to its knowledge of the misapplication of the trust funds by reason of the assignment to Bunker and Thiell, it, of course, had only constructive notice such as is imparted by proper recordations. So far as the case is concerned, the question of whether the notice to

the Humble was actual or constructive is of little importance. The authorities cited in the report of the master, and in the briefs, demonstrate that, even if the Humble is held only to have constructive notice, it is liable the same as though it had actual notice unless, of course, relieved by the statute of limitations or laches, and it is not considered that there are any circumstances in the case entitling it to these defenses. Having notice of the trusts, it was the duty of the Humble, equally with that of Bunker, in order to be acquitted from further responsibility to the cestuis que trustent, to apprise them of the transaction between it and the persons selling to it. It is true that, under the trusts as created, Bunker had the power of sale, and had a right to make a sale to the Humble. The Humble contacted none of the interest holders and made no effort to do so. It relied on Bunker to satisfy the unit holders and likely believed that he would do so. It had the assurance of Banker Thomas that Bunker was thoroughly reliable and faithful and would properly discharge every obligation owing to the unit holders. It may be further noticed that, in the discussions between Morgan and Cleaves, Cleaves was informed that it was the purpose of Bunker to organize a corporation in which he proposed to merge all of the interests of the unit holders and have the latter exchange their interests in the different clubs for stock in the new corporation. With this knowledge the Humble rested apparently secure in the thought that no claim would be made against it by any of the unit holders, although it may be said that the attorney for the Humble was of the opinion that the unit holders had no legal interest in the leases, by reason of the trust organizations, of a character which could be enforced against any purchaser from the trustees.

■ It is claimed that the unit holders, by taking stock in the World Oil Company, Inc., thereby ratified the acts of Bunker in making the sale to the Humble, and waived the fraud perpetrated upon them. This would be true, of course, if the unit holders had been theretofore correctly informed as to the real transaction with the Humble, but this was not done. The Humble made no explanation whatever to them, and Bunker misinformed them as to the profits he and his associates were making out of the deal, and by notices sent to them almost in effect made it a condition to their receiving the proposed $10 per unit dividend that their certificates of membership be exchanged for stock. It would be a manifest injustice to say that because the unit holders did not complain at the time of the sale to the Humble, and the organization of the World Oil Company, Inc., that they cannot do so now. They trusted Bunker and his promises, of course, and believed the report of his sale was accurate, and certainly remained in ignorance of the fraud without any fault on their part. It may be said that the Humble was not an actual participant in the fraud, and there was no effort on its part to conceal it from the knowledge of the beneficiaries, but it appears that the situation of the Humble here is very clearly fixed by the great weight of authority as shown by the briefs of complainants.

■ It will suffice to state the rule as perhaps best announced in the case of Redford v. Clarke, 100 Va. 115, 40 S. E. 630, 631, in which it was said: "The prevailing doctrine in the United States and the rule in this state is that a purchaser (of trust property) is not bound to see to the application of the purchase money, except where the sale is a breach of trust on the part of the trustee, of which the purchaser has notice, either from the face of the transaction itself, or otherwise. If he has such notice as makes him a party or privy to the trustee's misconduct, the property will be affected in his hands with the trusts which previously attached to it." While there are a good many circumstances in the case upon which, on behalf of the Humble, equity might look with favor, yet, when the equities are all balanced, I am of the opinion that the recommendations contained in the master's report as to a judgment against the Humble should be confirmed, with this modification; that the exceptions of the Humble to the conclusion No. 104 of the master should be sustained in part, and that, instead of the judgment there recommended to be entered in the sum of $150,000, less $1,700, with interest at the rate of 6 per cent. per annum from June 20, 1925, and the further sum of $67,088.36, with interest thereon at the rate of 6 per cent. per annum from the dates of the deferred oil payments, in that aggregate amount, the judgment should be for the sum of $150,000, less $75,000, with interest thereon as first above mentioned, and the further sum of $67,088.36, with interest, as before noted. This conclusion is arrived at by reducing the Humble judgment to the extent of the $75,000 cash payment made to defendant Frank M. Greene, and for the reason that I am of the opinion that, under all of the circumstances of this case, neither Greene nor the Humble should be held liable for this payment.

■ I think the master was correct in

concluding that there was no merit in the defense made that no valid and enforceable trusts existed. The defendants argued that the certificates of membership in the clubs were too indefinite and uncertain to create any such trusts, and that such certificates should be considered as the only evidence of the trust declaration. The master took into account in the creation of the trusts the literature sent out by Bunker to the public to induce subscriptions as indicia of the extent and character of the terms of the trusts, and in this he was quite correct. No specific description of any certain acreage was made in the membership certificates of the drilling clubs, but it was apparently the intention of the donors of the trust estate to dedicate thereto all of the acreage owned in Crockett county, and, of course, express trusts of this character are always construed most strongly against the grantor and most favorably to the grantees, and the capacity of a court of equity to enforce this sort of a trust cannot be questioned with any degree of soundness.

As to the judgment recommended against the defendant Greene, I am persuaded that the exceptions of the defendants to the report of the master should be sustained in part and overruled in part. I think judgment should go against Greene for the sum of $33,544.18, being the amount of the payments made to him out of oil runs after the organization of the World Oil Company, Inc., but that no further judgment should be entered against him. This, for the reason that it is beyond dispute that Bunker or his publishing corporation owed Greene $1,700 for back salary in connection with the drilling of the well, and at the time the agreement was had between Bunker and Greene, in the settlement of this indebtedness, it was agreed that Greene should have the assignment of the 40-acre offset (later conveyed to the Humble under the assignment hereinbefore mentioned) as part of the consideration of this indebtedness, and that Greene would continue his work in the drilling of the well. At the time of the assignment of this acreage to Greene, it had a value not to exceed the amount due him for services. He continued with the drilling of the well and thereby enhanced the value of the trust estate. The master found that, at the time of this assignment, Greene had no notice of the trust character of the property, and Bunker was a trustee with the power of sale. Furthermore, at the time of the sale to the Humble, the 40-acre offset was reasonably worth the amount of $75,000, which Greene received out of the cash payment. In balancing the equities, I think that neither Greene nor the Humble should be held to answer for this sum. The case is different with reference to the moneys received by Greene from the deferred oil payments. He participated in the organization of the World Oil Company, Inc., and was present as an organizing stockholder and director at the first meetings of the stockholders and directors, and aided Bunker in the fraud perpetrated on the unit holders in the clubs. He thereby had full knowledge of the trusts and the rights of the beneficiaries therein. He should not, in equity, be allowed any further profits after such knowledge, and that part of the master's conclusions No. 105, fixing the liability of Greene for the deferred oil payments received by him, is confirmed.

As to the recommendation that a judgment be entered against defendant Bunker, as contained in conclusion No. 104 of the report, the same is confirmed, and likewise the exceptions of defendant Bunker, as to the master's report, are in all respects overruled, and judgment should be entered against him in accordance with the recommendation of the master.

The master's recommendation as to judgment for costs is also adopted.

Let a decree be entered confirming the master's report and overruling the exceptions of all parties thereto, except in the particulars in which the findings of fact and conclusions of the master are herein modified.